861 A.2d 692

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

Nathan H. CHRISTOPHER, Jr.

Misc. Docket AG No. 36, Sept. Term, 2003.

Court of Appeals of Maryland.

Nov. 16, 2004.

Melvin Hirshman, Bar Counsel and Glenn M. Grossman, Deputy Bar Counsel, Attorney Grievance Comm. of Maryland, for Petitioner.

William A. Lee Clarke, Salisbury, for Respondent.

Argued Before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, Judge.

The Attorney Grievance Commission, acting through Bar Counsel, filed a petition for disciplinary action against Nathan H. Christopher, Jr. (Respondent) for violation of the Maryland Rule 16-812, Maryland Rules of Professional Conduct (MRPC). Bar Counsel also alleged that Respondent violated Maryland Rules 16-604 (Trust account—Required deposits),[1]

---

1. Rule 16-604 states:

16–607 (Commingling of funds),[2] and Maryland Code (1989, 1995 Repl.Vol.), § 10–306 of the Business and Occupation Article.[3] With respect to the MRPC, the petition alleged that Respondent violated Rule 1.1 (Competence),[4] 1.3 (Diligen-

---

Except as otherwise permitted by rule or other law, all funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution. This rule does not apply to an instrument received by an attorney or law firm that is made payable solely to a client or third person and is transmitted directly to the client or third person.

**2.** Rule 16–607 provides as follows:

a. **General prohibition.** An attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account by Rule 16–604 or permitted to be so deposited by section b. of this Rule.

b. **Exceptions.** 1. An attorney or law firm shall either (A) deposit into an attorney trust account funds to pay any fees, service charges, or minimum balance required by the financial institution to open or maintain the account, including those fees that cannot be charged against interest due to the Maryland Legal Services Corporation Fund pursuant to Rule 16–610 b 1(D), or (B) enter into an agreement with the financial institution to have any fees or charges deducted from an operation account maintained by the attorney or law firm. The attorney or law firm may deposit into an attorney trust account any funds expected to be advanced on behalf of a client and expected to be reimbursed to the attorney by the client.

2. An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the attorney or law firm. The portion belonging to the attorney or law firm shall be withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved.

3. Funds of a client or beneficial owner may be pooled and commingled in an attorney trust account with the funds held for other clients or beneficial owners.

**3.** Md.Code Ann., Bus. Occ. & Prof. Art section 10–306 provides:

A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer.

**4.** Rule 1.1 provides as follows:

A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

ce),[5] 1.5 (Fees),[6] Rule 1.15 (Safekeeping property),[7] 3.3 (Can-

5. Rule 1.3 provides as follows:

A lawyer shall act with reasonable diligence and promptness in representing a client.

6. Rule 1.5 provides (in part) that:

(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the result obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

7. Rule 1.15 provides as follows:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

dor toward the tribunal),[8] and 8.4 (Misconduct).[9] Bar counsel recommends disbarment.

Pursuant to Maryland Rule 16–752, we referred the matter to Judge Kathleen L. Beckstead of the Circuit Court for Wicomico County to make findings of fact and conclusions of law. Following an evidentiary hearing, Judge Beckstead found that Respondent had violated MRPC Rules 1.1, 1.3, 1.5, 1.15, 3.3, and 8.4. Neither Bar Counsel nor Respondent filed exceptions to Judge Beckstead's findings.

## I.

The charges in this matter arose out of Respondent's representation of the Estate of Gordon Bryce Revelle, filed in the Orphans' Court for Somerset County. Respondent began initially as the attorney for the estate and, after the death of the personal representative, Respondent applied for and was appointed, to serve as the personal representative. It was alleged that Respondent accepted a $5,000 fee for his services to the estate but deposited the funds into his escrow account. The fee, however, was neither approved by the court nor listed as a disbursement in any of the estate accountings filed by Respondent. In addition, Respondent knowingly submitted a false accounting and knowingly misrepresented the value of the estate funds to the court. After an evidentiary hearing in this disciplinary matter, Judge Beckstead made the following factual findings:

---

**8.** Rule 3.3(a)(1) provides as follows:

A lawyer shall not knowingly:
 (1) make a false statement of material fact or law to a tribunal[.]

**9.** Rule 8.4 provides, in pertinent part, as follows:

It is professional misconduct for a lawyer to:
 * * * *
 (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
 (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
 (d) engage in conduct that is prejudicial to the administration of justice;
 * * * *

"Based upon the testimony and exhibits produced at the hearing, the Court finds the following facts to be established by clear and convincing evidence:

Nathan H. Christopher, Jr. graduated from the University of Baltimore School of Law in 1980. He was admitted to the Maryland Bar in 1981. He is also a member of the Federal Bar. He has never been disciplined during the twenty years he has practiced law. During the years 2000 through 2003 he engaged in the private practice of law as a solo practitioner out of his home in Crisfield, Somerset County, Maryland. He also maintained an office in Salisbury, Maryland during the relevant time herein.

Mr. Christopher maintained an attorney trust account as part of his private practice. He did not maintain a business operating account for his practice, instead he paid business expenses from a personal banking account in his name. All monies received on behalf of his clients were maintained in his attorney trust account.

Representation of criminal defendants as a panel public defender constituted ninety percent (90%) of Mr. Christopher's practice. In order to obtain payment for his services, he would complete and submit a fee petition at the conclusion of his representation. The Comptroller would send Mr. Christopher his approved fee. Mr. Christopher deposited fees earned from his work as a panel public defender into his attorney trust account before he drew it out for his own use. A total of eighty (80) remittance checks from the office of the public defender were deposited into his attorney trust account during the period from August 2000 to February 2003. These remittances represented fees earned by Mr. Christopher and constituted his own money, not client trust funds. See Exhibit # 1, Sub-exhibit # 7 (deposit slips).

The Respondent was retained by Susan R. Howard to represent the Estate of Gordon Bryce Revelle, who died on June 16, 2000, leaving a Last Will and Testament. Ms. Howard was appointed as personal representative of the estate on August 21, 2000. Ms. Howard was also the sole beneficiary of Mr. Revelle's estate.

Ms. Howard maintained the estate checkbook from the time of her appointment until her death on August 15, 2001.

On May 11, 2001, the Respondent requested Five Thousand Dollars ($5,000) from Ms. Howard to cover his anticipated fees and costs. He made this request of Ms. Howard due to his concerns that the estate assets were being depleted by Ms. Howard and that insufficient funds would remain to pay his fee and estate expenses. In response, Ms. Howard wrote Mr. Christopher a check for Five Thousand Dollars from the estate account, which he deposited into his trust account on May 11, 2001. This disbursement of estate funds had not been reported to or approved by the Orphans' Court.

The initial Inventory prepared by Mr. Christopher and filed with the Orphans' Court on May 14, 2001 reported estate property totaling $91,631.72, of which $41,411.72 was reported as bank accounts, savings and cash.

The First Administration Account was filed July 11, 2001, after a Show Cause Order was issued by the Orphans' Court. It reported $91,631.72 in estate assets, and requested approval of a total of $135 in expenditures. See Exhibit # 1, Sub–Exhibit # 9. The $5,000 fee expenditure was not reported. A December 7, 2000 estate expenditure of $435 paid to Mr. Christopher to reimburse him for charges against the estate was not reported on this accounting either. Mr. Christopher could not explain his failure to report these expenditures in his First Administration Accounting.

Ms. Howard died on August 15, 2001. The Court finds that Mr. Christopher was on notice at the time of Ms. Howard's death on August 15, 2001 that estate monies were missing based upon his testimony that, "At the time Ms. Howard died and I went through the house, there was, there was nothing. I mean, there were no canceled checks. There were no copies of bank statements *or anything to indicate where the money had gone.*" Tr. at page 74. This is also consistent with his request in May of 2001 for a $5,000 check.

On January 23, 2002, the Orphans' Court notified Mr. Christopher that the Second Administration Accounting was due. Subsequently, a Show Cause Order was issued for the Second Accounting on April 2, 2002.

On May 7, 2002, Mr. Christopher filed a Petition to Be Appointed Successor Personal Representative of the Estate of Gordon Bryce Revelle, which was granted by Order of the Orphans' Court dated May 14, 2002. A Second Administration Account was filed by Mr. Christopher, under oath, on May 7, 2002. The Second Administration Account reported estate assets of $91,496.72. The accounting requested approval of a total of $900 in expenditures for appraisals and grass cutting. Once again, neither the Five Thousand Dollar fee nor the December 7, 2000 estate expenditure of $435 paid to Mr. Christopher to reimburse him for charges against the estate were reported. See Exhibit # 1, Sub-Exhibit 10. Furthermore, notwithstanding the fact that he was on notice that Ms. Howard had expended significant estate assets, he made no report, nor investigated further prior to filing the Second Accounting.

On August 14, 2002, Mr. Christopher closed out the estate account at Peninsula Bank. Mr. Christopher admitted that as of this date he knew, unequivocally, that Ms. Howard had, in fact, significantly depleted the estate assets during her tenure as personal representative. Mr. Christopher also acknowledged that between May 14, 2002 and August 14, 2002 he had requested and received copies of the estate's bank statements. His check for the estate's bank statements was made on July 31, 2002, which he testified was the date he received the bank statements. He further testified that the reason he closed the account was because the bank statements reflected that America–On–Line was automatically debiting the account on a monthly basis, and he could not arrange to have them cease doing so. He deposited the proceeds of the estate checking account, totaling $2,230.25 into his trust account.

On November 14, 2002, Mr. Christopher filed a Third Administration Account, under oath, which reported estate

assets of $90,596, and requested approval of a total of $1,350.67 in expenditures for the property bond and real estate taxes. He admitted that he knew the accounting to be false when he signed it and filed it with the Orphans' Court. He filed the false report to gain more time to determine how to proceed because he did not know how to account for the missing money. Neither the Five Thousand Dollar ($5,000) fee nor the December 7, 2000 estate expenditure of four hundred thirty-five dollars ($435) paid to Mr. Christopher to reimburse him for charges against the estate were reported.

In December of 2002, Mr. Christopher advised the Register of Wills, Gary W. Miller, that he had falsified the last accounting. See Letter of Orphans' Court Judges to Mel Hirshman dated January 21, 2003 which is contained in Plaintiff's Exhibit 8. Mr. Christopher was removed as personal representative of the estate on December 10, 2002.

The Attorney Grievance Commission began its investigation during February 2003.

Mr. Christopher filed a Fourth Administration Account dated June 6, 2003. This account accurately reflected Ms. Howard's "advanced distributions" as personal representative totaling $32,461.82. In addition, the Fourth Administration Account properly reported previously undisclosed expenditures to the Court.

On December 14, 2004, after accounting to the Court, Mr. Christopher forwarded to Lynn Stein, successor personal representative, a check in the amount of $2,000 representing the remaining estate proceeds in his trust account. He never submitted a request for fee to the Orphans' Court, nor took any fee. In fact, he overpaid the estate by $310.00.

Mr. Christopher's bank records reflect that on September 10, 2002, his trust account balance fell below the total estate assets deposited into the trust account to be held for the estate by Five Hundred Seventeen Dollars and Seventy Four Cents ($517.74). Mr. Christopher testified that on September 10, 2002 the withdrawal which caused the deficit was a twelve hundred dollar check drawn for his personal

use. On September 11, 2002 two deposits were made totaling $1,453. The deposit slips introduced into evidence, do not establish whether the deposits were, or were not, received at the bank after 2pm on September 10, 2002. In either event, the deficit lasted, at most, for a period of twenty-four hours. Mr. Christopher's trust account was never overdrawn during the relevant time frame. His use of estate assets was not knowing and intentional.

Mr. Christopher began drinking heavily in the mid–1980s. Mr. Christopher suffered a heart attack in August of 2000. As a result, a stent was placed in his chest. He was hospitalized for three days. His recovery lasted nine months. He stopped drinking for six to eight months following his heart attack. During his post-operative recovery, he testified that he experienced anxiety and was treated with medication prescribed by his neurologist. His medical record reveals that he was evaluated by a neurologist in November 2000, and was treated for depression with antidepressant medications.

He underwent a second hospitalization due to heart attack-like symptoms, which were ultimately diagnosed as a panic attack, in May 2003. In June of 2003 he began seeing Talmadge Reeves, a psychiatrist. Dr. Reeves diagnosed him with depression and alcohol dependence. He was placed on Wellbutrin, Trazondone, Zyprexa and Antabuse. Although sober, his psychiatric condition was not improved.

In May or June of 2003, Mr. Christopher sought help from the Maryland State Bar Association Lawyer Assistance Program. He continues to be monitored by that program for substance abuse and mental health issues, and has been fully compliant with their short term and long term requirements, which are set forth more fully in Respondent's Exhibit # 5C. The Director and Assistant Director of the Lawyer's Assistance Program have concluded that, as of May 12, 2004, Mr. Christopher is a man using sound judgment who demonstrates remorse for his past behavior, and who is an honest, responsible, and stable member of the community.

On November 29, 2003, Mr. Christopher was admitted into the psychiatric unit of the Dorchester General Hospital after being found in Cambridge, Maryland behaving bizarrely. He was diagnosed with acute rhabdomyolysis secondary to the use of Zyprexa and Xanax. It is unclear whether the episode was the result of taking excessive dosages or not. A psychological evaluation was conducted and the results were consistent with a diagnosis of Major Depression, Severe, Without Psychotic Features, and Alcohol Dependence. He was treated with Neurontin and Zoloft with moderate success. He remained at Dorchester General Hospital until December 24, 2003, when he was transferred to the Eastern Shore State Hospital in Cambridge, Maryland.

He remained at Eastern Shore State Hospital until February 22, 2004. Since his discharge he has been treated by the Lower Shore Clinic for his psychiatric issues and has continued to attend AA meetings.

Dr. Tellefsen testified, very credibly, within a reasonable degree of medical certainty that Mr. Christopher was suffering from Alcohol Dependence and Severe Major Depression during the years 2000 through 2004. In her expert opinion, these conditions were the "root cause" of Mr. Christopher's inaccurate estate accounting and misappropriation of estate assets, although not the cause of his long history of commingling funds. The Court accepts Dr. Tellefsen's opinion."

After reviewing the applicable law and the parties' arguments, the hearing court made "Conclusions of Law" as follows:

Respondent [violated MRPC 1.1 by failing] to provide competent representation to his client when he:

(1) requested a $5,000 fee expenditure from his client and failed to report it to the Orphans' Court or have it approved;

(2) failed to report both the $5,000 fee expenditure and a $435 estate expenditure on the First Administration Account filed July 11, 2001;

(3) failed to report both the $5,000 fee expenditure and the $435 estate expenditure on the Second Administration Account filed May 7, 2002;

(4) failed to investigate the estate account history after notice of improper and unreported expenditures by the personal representative;

(5) failed to inform the Orphans' Court that the personal representative had significantly depleted the estate assets when he discovered this fact on August 14, 2002;

(6) mishandled estate funds when he closed the estate bank account on or about August 14, 2002, and transferred the funds into his trust account;

(7) misappropriated $517.74 of estate assets on September 10–11, 2002; and

(8) knowingly executed a false accounting, under oath, when he signed and filed the Third Administration Account on November 14, 2002.

Respondent's mishandling of the estate, estate accountings, and his escrow account clearly constitutes incompetence, as each of these incidents demonstrates a lack of thoroughness and preparation necessary for the representation of the estate.

[Respondent violated Rule 1.3 when he] failed to act with reasonable diligence and promptness when he failed to file the Second and Third Administration Accounts in a timely manner and undertake a timely investigation into the estate account history prior to filing the Second and Third Administration Accounts.

Respondent failed to comply with Rule 1.5 when he requested $5,000 from his client to cover anticipated fees and costs and failed to petition the Court for these fees or report this money to the Court on the first three accounts.

[When] Respondent failed to hold his client's property in an account separate from his own property [he violated Rule 1.15]. Respondent deposited fees earned from his work as a panel public defender into his attorney trust account before he drew it out for his use. These remittances represented

fees earned by Respondent and constituted his own money, not client trust funds.

In addition, Mr. Christopher unintentionally and unknowingly misappropriated estate assets when he withdrew $1,200 from his trust account, creating a deficit in the estate balance by $517.74.

> Where [an] attorney deposited earned fees and money he received from his father into a bank account he titled as an attorney trust account, and used this account for personal and business purposes, such conduct constituted clear and convincing evidence of commingling in violation of both Md. Rules of Professional Conduct 1.5(a) and Md. Rule 16–607. *Attorney Grievance Commission v. Thompson,* 376 Md. 500, 830 A.2d 474 (2003).

Respondent [did not comply with Rule 3.3 when he] was not candid with the Orphans' Court when he failed to report both the $5,000 fee expenditure and a $435 estate expenditure on the First Administration Account filed July 11, 2001, when he failed to report both the $5,000 fee expenditure and the $435 estate expenditure on the Second Administration Account filed May 7, 2002, and when he knowingly signed and submitted the false Third Administration Account on November 14, 2002.

Respondent violated Rule 8.4 when he knowingly violated the aforementioned rules of professional conduct, engaged in fraud and perjury by knowingly submitting a false accounting, and knowingly misrepresenting the value of estate funds in the estate bank account.

## II.

Mr. Christopher recommends that the appropriate sanction for his conduct is a reprimand and continued monitoring by the MSBA Lawyer Assistance Program in reliance upon the opinion of Board certified forensic psychiatrist Christine Tellefsen, M.D., who was asked by Bar Counsel to evaluate Respondent. In Dr. Tellefsen's opinion, Respondent's "mental and physical conditions were the root cause of his professional

misconduct, other than commingling fees and trust funds." Bar Counsel, however, recommends disbarment because "Respondent engaged in fraud and perjury by knowingly submitting a false accounting and by knowingly misrepresenting the value of estate funds in the estate bank account," including other serious misconduct. In Bar Counsel's view, Dr. Tellefsen's opinion concerning Mr. Christopher's severe major depression and dependence on alcohol during the years 2000 through 2004, standing alone, "is insufficient to mitigate the Respondent's criminal behavior and dishonesty such that a sanction less than disbarment is warranted." According to Bar Counsel, the evidence presented with regard to the period under consideration does not support a conclusion that "Respondent was utterly unable to conform his conduct in accordance with the law and the Maryland Rules of Professional Conduct."

Pursuant to Md. Rule 16–757(b), at a hearing of a disciplinary or remedial action the Attorney Grievance Commission has the burden of proving by clear and convincing evidence the averments of the petition. In accordance with that same rule, the respondent has the burden of proving an affirmative defense or a matter of mitigation or extenuation by a preponderance of the evidence.

It is well settled that this Court exercises original jurisdiction over attorney discipline proceedings. We conduct an independent review of the record, accepting the hearing judge's findings of fact unless clearly erroneous. We will not disturb the factual findings of the hearing judge if they are based on clear and convincing evidence. Our review of the hearing judge's conclusions of law is de novo.

*Attorney Griev. Comm'n v. Gore*, 380 Md. 455, 468, 845 A.2d 1204, 1211 (2004) (quoting *Attorney Griev. Comm'n v. Davis*, 375 Md. 131, 157–58, 825 A.2d 430, 445–46 (2003) (citations omitted)).

Md. Rule 16–759(b)(A) provides: "If no exceptions are filed, the Court may treat the findings of fact as established for the

purpose of determining appropriate sanctions, if any." Neither party to this proceeding filed exceptions to the hearing court's findings of fact and conclusions of law. Thus, based upon our review of the record, we are satisfied that the evidence supports the hearing judge's findings of fact in accordance with the clear and convincing evidence standard.[10] In addition, we agree with the hearing judge that Mr. Christopher violated Md. Rules 16–604 and 16–607, as well as Section 10–306 of the Business and Occupation Article. In addition, we agree that Mr. Christopher violated MRPC Rules 1.1, 1.3, 1.5, 1.15, 3.3, and 8.4. The sole issue in this case is the resolution of the appropriate sanction to impose because of Mr. Christopher's misconduct. In answering that question, we review our recent cases, keeping in mind that our goal in matters of attorney discipline is to protect the public and the public's confidence in the legal profession rather than to punish the attorney. *See Attorney Griev. Comm'n. v. Vanderlinde,* 364 Md. 376, 388, 773 A.2d 463, 470 (2001).

We have said that, "[d]etermining the appropriate sanction requires the Court to consider the facts and circumstances of each particular case, including consideration of any mitigating factors." *Attorney Griev. Comm'n v. Post,* 379 Md. 60, 71, 839 A.2d 718, 724 (2003). We have recognized that "the nature and gravity of the violations and the intent with which they were committed" are relevant considerations. *Id.* quoting *Attorney Griev. Comm'n of Maryland v. Awuah,* 346 Md. 420,

---

**10.** The dissent asserts that it is a misstatement or misreading of the record to say that Mr. Christopher's mental and physical condition caused his misconduct. (Opinion, page 628). To the contrary, our decision is based squarely upon the uncontroverted findings of fact of the hearing judge. Our standard of review in these matters requires that we "accept a hearing judge's findings of facts unless clearly erroneous." *Gore,* 380 Md. at 468, 845 A.2d at 1211. Furthermore, Md. Rule 16–759(b)(A) specifically provides that "[i]f no exceptions are filed, the Court may treat the findings of fact as established for the purposes of determining the appropriate sanctions, if any." No exceptions were filed with regard to the findings of fact and conclusions of law of the hearing judge. Therefore, we accept Dr. Tellefsen's report and conclusions as established facts for purposes of determining the appropriate sanction in this case.

435, 697 A.2d 446, 454 (1997). We also have considered "the attorney's prior grievance history ... the attorney's remorse for the misconduct, and the likelihood of the conduct being repeated." *Post,* 379 Md. at 71, 839 A.2d at 724–725 (citations omitted).

We have found that a less severe sanction than that ordinarily dictated may be appropriate when an attorney is able to establish the existence of compelling extenuating circumstances. *Attorney Griev. Comm'n v. Kenney,* 339 Md. 578, 588, 664 A.2d 854, 859 (1995) (citations omitted). We have held that "compelling extenuating circumstances": "[Are] only those which may cause this Court to view the conviction in a light which tends to show that the Respondent's illegal act, committed in violation of a criminal statute, resulted from intensely strained circumstances or that the magnitude and the nature of the crime are not so severe as to compel disbarment." *Kenney,* 339 Md. at 588, 664 A.2d at 859 (internal citations omitted).

We have determined in the past that alcoholism is a mental condition that qualifies as one such mitigating factor sufficient to warrant a sanction less severe than disbarment. *Kenney,* 339 Md. at 588, 664 A.2d at 859. The record must show, however, that "the evidence before the hearing judge was legally sufficient to establish a causal relationship between the misconduct and the alcoholism," and that the addiction was to a substantial extent responsible for the conduct of the attorney. *Kenney,* 339 Md. at 589, 664 A.2d at 859. Our focus has been on whether the alcoholism, health, mental problem or physical condition of the attorney was the "root cause," i.e., responsible for the misconduct of the attorney. *Vanderlinde,* 364 Md. at 408–09, 773 A.2d at 482 (tracing the history of this Court's acceptance of an attorney's mental condition or impairment arising from alcohol and depression as a mitigating factor).

Recently in *Attorney Griev. Comm'n v. Goodman,* 381 Md. 480, 850 A.2d 1157 (2004), we held that disbarment was the appropriate sanction for an attorney's misconduct in filing a

complaint under a different attorney's name and misleading the trial judge to believe that the attorney was standing in for the attorney named in the pleading. In mitigation, Mr. Goodman argued that his health problems, i.e., his low blood sugar and a bad reaction to some medication he was taking caused his misconduct. The trial judge who conducted the disciplinary hearing found no medical evidence that respondent had low blood sugar during the relevant time. "There was no evidence that respondent was unable to think clearly during the period in question." Moreover, Dr. Adle, the psychologist who performed a psychological evaluation of Mr. Goodman, concluded that Mr. Goodman suffered from diabetes, a history of chronic pain, financial stress, anxiety, and depression, but he could not confirm that Mr. Goodman had depression or anxiety during the relevant time period. In addition, Dr. Tellefsen testified, as a rebuttal witness for Bar Counsel, that she was "unable to find any mental condition that was impairing [Mr. Goodman's] ability to function at the time." *Goodman*, 381 Md. at 489, 850 A.2d at 1162. The hearing court ultimately concluded that

> the record did not establish that any mental health disorder caused [Mr. Goodman's] behavior ... none of the other problems experienced by [Mr. Goodman] (car accidents, bankruptcy, financial stressors, pain and sleep medication, diabetes, depression) caused his behavior in this case ... the record "establishes [Mr. Goodman's] behavior was motivated by his desire not to interfere with his job as an APD, his belief that the case would be settled, and his desire no to appear as both a witness and the attorney of record."

*Id.*

Neither the hearing court nor this Court found any compelling extenuating circumstances to justify imposing less than the most severe sanction of disbarment. Similarly in *Vanderlinde*, 364 Md. 376, 773 A.2d 463, a case upon which our holding in *Goodman* rests, we held that an attorney's dysthymic disorder, or long lasting depression, was not the cause of her dishonest behavior or a reason for her to avoid disbarment. *Vanderlinde*, 364 Md. at 387, 414, 773 A.2d at 469, 485.

In *Vanderlinde,* an attorney, over a period of time, while working outside of the profession of law, misappropriated money from her employer for her own use. *Vanderlinde,* 364 Md. at 381, 419, 773 A.2d at 465, 488. In that case, the hearing judge "expressly found that [Vanderlinde], in spite of her mental condition, was able to control her conduct. The evidence supported that finding. [The hearing judge] declined to find that [Vanderlinde's] mental condition was the root cause of the misappropriation. [The hearing judge] agreed with Dr. Tellefsen in that regard." *Vanderlinde,* 364 Md. at 387–88 n. 6, 773 A.2d at 469 n. 6. Although Dr. Blumberg, a witness for the respondent, found that Ms. Vanderlinde's condition "significantly impaired her judgment" and "was the root cause of the misconduct," Dr. Tellefsen, called in rebuttal, disagreed that Ms. Vanderlinde's mental condition was the root cause of her conduct. *Vanderlinde,* 364 Md. at 387, 773 A.2d at 469. It is noteworthy that, "both Drs. Blumberg and Tellefsen testified that [Ms. Vanderlinde] knew that her conduct was wrong and that she could have controlled that conduct." *Id.*

At the outset in *Vanderlinde,* Judge Cathell, writing for the Court, cautioned that "we will keep in mind, especially in cases of dishonesty, intentional misappropriation, fraud, serious criminal cases, and the like, that our primary function always is to protect the public, not attorneys...." *Vanderlinde,* 364 Md. at 388, 773 A.2d at 470. Further expounding on that proposition, Judge Cathell wrote that

in cases of intentional dishonesty, misappropriation cases, fraud, stealing serious criminal conduct and the like, we will not accept, as "compelling extenuating circumstances," anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the "root cause" of the misconduct and that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the MRPC. Only if the circumstances are that compelling, will we even consider imposing less than the most severe sanction of

disbarment in cases of stealing, dishonesty, fraudulent conduct, the intentional misappropriation of funds or other serious criminal conduct, whether occurring in the practice of law or otherwise.

*Vanderlinde,* 364 Md. at 413–14, 773 A.2d at 485.

Furthermore, in *Vanderlinde,* we did not find the circumstances so compelling. There was scant evidence that Ms. Vanderlinde could not handle the every day economic affairs of her life. "[S]he was able to keep a fairly complex scheme operating over a long period of time without being found out, and eventually was able to return the monies before the thefts were discovered." *Vanderlinde,* 364 Md. at 415, 773 A.2d at 486. We concluded that "[h]er mental problems did not affect her ability to be a competent and, for a period, successful thief." *Id.* Even though there was no evidence of alcohol abuse, we made it clear that "[t]he existence of such factors is less compelling in serious cases." *Vanderlinde,* 364 Md. at 414, 773 A.2d at 485.

*Vanderlinde* also illustrates that given the facts and circumstances of the attorney's misconduct—dishonesty, deceit, fraud and the like—we will normally accept a hearing court's findings that certain mental conditions exist and have certain effects. *Id.* But, this Court has the ultimate duty to answer the question of whether such findings are compelling extenuating circumstances that justify a lesser sanction. *Id.* As a matter of policy we have said that in considering offenses relating to honesty, mental impairment, whether arising out of alcoholism or out of other factors, will not warrant a sanction lesser than disbarment unless there is

almost conclusive, and essentially uncontroverted evidence that would support a hearing judge's finding not only that the attorney had a serious and debilitating mental condition but also that the mental condition, in a sustained fashion, affected the ability of the attorney in normal day to day activities, such that the attorney was unable to accomplish

the least of those activities in a normal fashion. Unless that standard is met, the impairment is not "the root cause" of the misconduct.

*Vanderlinde*, 364 Md. at 418–19, 773 A.2d at 488.

Prior to *Vanderlinde*, and in the case of *Kenney*, we held that an indefinite suspension was the appropriate sanction where the hearing judge found that the attorney's misappropriation of client funds was caused by the attorney's alcoholism. This Court emphasized that because of the hearing judge's specific factual findings that alcoholism was, "to a substantial extent, the responsible, the precipitating, the root cause" of the attorney's misconduct, in that case, we would adhere to precedent and impose a sanction of indefinite suspension rather than disbarment. *Kenney*, 339 Md. at 586, 590, 664 A.2d at 858, 860. Because of our skepticism about the use of alcoholism as a mitigator, we cautioned the Bar that in the future, absent truly compelling extenuating circumstances, alcoholism would not constitute a sufficient mitigator to conduct that would otherwise warrant disbarment as the appropriate sanction. *Kenney*, 339 Md. at 578, 591, 664 A.2d at 854, 860. On the other hand, we observed that, "alcoholism is a serious medical condition and we will be more sympathetic to attorneys who recognize their need for assistance and seek to rehabilitate themselves before their transgressions are discovered." *Kenney*, 339 Md. at 595, 664 A.2d at 862. Thus, in both *Vanderlinde* and *Kenney*, we adhered to the policy that "[s]evere sanctions are necessary to protect the public from being victimized from any further dishonesty on the part of the attorney." *Kenney*, 339 Md. at 594–95, 664 A.2d at 862. Specifically, in *Vanderlinde*, we expounded upon our holding in *Kenney* and explained that in the cases of stealing, dishonesty, fraudulent conduct, the intentional misappropriation of funds, or other serious criminal conduct, we will not consider imposing less than the most severe sanction of disbarment, absent compelling circumstances. *Vanderlinde*, 364 Md. at 414, 773 A.2d at 485.

## III.

 In the present case, Mr. Christopher's mental condition and impairment arising from alcoholism and severe depression are compelling extenuating factors that affected his ability to function in his normal day-to-day activities, in a sustained fashion, between the years 2000 and 2004. In August 2000, Mr. Christopher was hospitalized for myocardial infarction.[11] His cardiac problems improved, but once he withdrew from alcohol after his heart attack, he "developed severe chronic daily headaches." In November 2000, he was treated by a neurologist because of depression, prior alcohol dependence, and recent sobriety. He was treated with antidepressants without much success. After seeing a neurologist in November 2000, Mr. Christopher continued to suffer from anxiety and depression and feeling drugged and unable to work because of the effects of the medication he was taking.

In June 2003, his diagnosis was "depression and alcohol dependence with emerging sobriety." His psychiatrist, Dr. Reeves, prescribed Antabuse,[12] Wellbutrin,[13] Trazodone,[14] and Zyprexa,[15] resulting in only brief periods of improvement in his mental health. In November, Mr. Christopher was admitted to Dorchester General Hospital because of his bizarre behavior in the community. He remained there for approxi-

---

11. Popularly known as a heart attack, sudden death of part of the heart muscle characterized, in most cases, by severe, unremitting chest pain. ENCYCLOPEDIA OF MEDICINE, 710–12, The American Medical Association (1989).

12. Trade name for disulfiram (a drug used to act as a deterrent to drinking alcohol). DORLAND'S, pp. 95, 536.

13. Trade name for a preparation of bupropion hydrochloride (a drug used in antidepressants). DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 253, 1985 (29TH Ed.2000).

14. An antidepressant drug. ENCYCLOPEDIA OF MEDICINE, 1008.

15. Trade name for a preparation of olanzapine (a drug used for the symptomatic management of psychotic disorders). AHFS DRUG INFORMATION, 2271, 2285, American Society of Health System Pharmacists, (2004), § 28:16.08.04.

mately one month, confined to the psychiatric ward of the hospital. During his hospitalization he was "confused and amnestic." [16] The doctors administered antipsychotic medication to him while he was there. Mr. Christopher was discharged "after findings which were consistent with a diagnosis of Major Depression, Severe, Without Psychotic Features, and Alcohol Dependence."

After a month of treatment, doctors determined that Mr. Christopher needed further hospitalization, and he was confined at the Eastern Shore State Hospital. After testing and treatment at that facility, Mr. Christopher was discharged after two months with a "diagnosis of alcoholism, addiction and psychopathic deviance." At the time of his discharge, he was prescribed Zoloft [17] and Neurontin.[18] "Following the onset of confusion, it took three months of hospitalization before [Mr. Christopher] was stable enough to be returned to the community." According to his medical records, "his treatment for major depression has been complicated by his physical health condition and hepatic sensitivity." [19]

Dr. Tellefsen testified that, "in her opinion and to a reasonable degree of medical certainty, Mr. Christopher was suffering from Alcohol Dependence and Severe Major Depression during the period of 2000 to 2004 . . . [and that h]is mental conditions were the root cause of his misconduct during the years 2000 to 2004." This testimony was neither controverted nor does Bar Counsel challenge Dr. Tellefsen's conclusions or the hearing judge's factual findings.

---

16. Amnestic is a disturbance in memory that is either due to the direct physiological effects of a general medical condition or due to the persisting effects of a substance. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 155–56, American Psychiatric Association, 4th Ed. § 294.8 (DSM–IV).

17. Trade name for preparation of sertraline hydrochloride (used as an antidepressant). DORLAND'S, 1629, 1997.

18. Trade name for a preparation of gabapentin (used as adjunctive therapy in the treatment of partial seizures). DORLAND'S, 721, 1212.

19. Hepatic is related to the liver.

Mr. Christopher was counsel of record for the Estate of Gordon Bryce Revelle from August 2000 until December 10, 2002. He admitted that he knew the Third Administration Account, filed under oath, was false when he signed it and filed it with the Orphans' Court. He explained that he filed the false report "to gain more time to determine how to proceed because he did not know how to account for the missing money." "Neither the Five Thousand Dollar ($5, 000) fee nor the December 7, 2000 estate expenditure of four hundred thirty-five dollars ($435) paid to Mr. Christopher to reimburse him for charges against the estate were reported."

In December 2002, Mr. Christopher informed the Register of Wills that he had filed a false accounting. Shortly thereafter, on December 10, 2002, Mr. Christopher was removed as personal representative of the estate.

The Attorney Grievance Commission began its investigation in February 2003, and on June 6, 2003, Mr. Christopher filed a Fourth Administration Account. This accounting was accurate. After properly reporting to the court the expenditures of the estate, "Mr. Christopher paid the successor personal representative of the estate, $2,000 representing the remaining estate proceeds in his trust account. He never submitted a request for a fee to the Orphans' Court, nor took a fee. In fact, he overpaid the estate by $310.00."

We note that Mr. Christopher reported his dishonesty to the Register of Wills before any investigation began concerning his transgressions. Furthermore, Dr. Tellefsen stated in her report that, "It is not clear if [Mr. Christopher's] more severe depression erupted over the years in relation to his alcoholism or if it was a separate issue which was exacerbated by his alcoholism." It is clear, however, that he had symptoms consistent with severe major depression for at least four years. His behavior over the past four years and his handling of the Revelle estate was consistent with "self-neglect and haphazard attention to tasks suggestive of Alcoholism and Major Depression." Thus, while under this state of severe

depression, it appears that Mr. Christopher was unable to control his conduct.

Mr. Christopher made efforts to address his medical condition. In June 2003, he began treatment with a psychiatrist, Dr. Reeves, and shortly thereafter, began treatment in Alcoholics Anonymous. Although Mr. Christopher did not begin treatment until after he disclosed his transgressions and after the Attorney Grievance Commission began its investigation into his misconduct, nonetheless, we are impressed that Respondent recognized the need for assistance and sought to rehabilitate himself. *See Kenney,* 339 Md. at 595, 664 A.2d at 862. His acknowledgment of wrongdoing was, indeed, a first and crucial step in the rehabilitative process.

Because of the compelling extenuating circumstances of this case, we believe the appropriate sanction is an indefinite suspension, with the right to apply for reinstatement. The public and the legal profession are better served by lawyers who admit and correct their errors. There is ample evidence in the record that if Respondent, "continues to seek psychiatric treatment, is compliant with his medication, and remains sober, his ability to practice law [can be] restored." Ever mindful that our goal in attorney disciplinary proceedings is the protection of the public, we hold that the extenuating circumstances of this case compel a less severe sanction than disbarment.

Mr. Christopher's severe major depression and alcoholism culminated in a three month hospitalization which included the administration of antipsychotic and antidepressive drug therapy. His debilitating mental and physical condition has lasted for a long period of time and is the root cause of his misconduct, except for his commingling of fees and trust funds. His explanation for placing earned fees into his trust account was to avoid the situation of ever overdrawing that account. Although we do not approve of such a practice, the explanation is illustrative of Mr. Christopher's confused thought process during the relevant time period. Thus, we cannot say that his confused state of mind and severe depression did not affect his

day to day practice of law. We are not convinced, however, that just because Respondent regularly appeared in District Court as a panel attorney, during the period of his depression, he was able to conform his conduct in accordance with the law and the MRPC.

Between August 2000 and February 2003, Mr. Christopher made regular court appearances and deposited into his account approximately 80 checks representing payment for his services. There was evidence, on the other hand, that he did not spend adequate time on case preparation during the period in question. Since 2000, he experienced intense anxiety and had difficulty concentrating and making decisions. For a period of time after his heart attack in November 2000, Mr. Christopher developed severe chronic headaches which continued daily. He was evaluated by a neurologist in November 2000. There was, at that time, evidence of depression and alcohol dependence. During this period, Mr. Christopher took antidepressants, one of which was Pamelor. When he took this medication he felt drugged and was unable to work. In Dr. Tellefsen's written summary of her evaluation of Mr. Christopher, she informed Bar Counsel that with regard to the Estate of Gordon Bryce Revelle, "[Respondent] reported feeling confusion, apathy and hopelessness in regard to that case. At the same time, he reported that he was attending to his other less complicated criminal cases, although he was not actually doing much work in general." In addition, Dr. Tellefsen testified at the disciplinary hearing with regard to Mr. Christopher's behavior, that "the failure to perform his obligations, the procrastination, the neglect, [are] behaviors that are consistent with depression and alcoholism."

If an attorney, through treatment, can adequately address a mental or physical problem affecting his ability to competently practice law, he or she should be given an opportunity to correct that problem. Any petition for reinstatement will have to address the Respondent's then present mental condition, as well as his overall fitness to resume the practice of law. At a minimum, any petition for reinstatement must contain the following: (1) a statement signed by Dr. Tellefsen

or other similarly qualified health care professional certifying that Nathan H. Christopher, Jr. is currently mentally and physically competent to practice law and is receiving ongoing treatment; (2) verification from the MSBA Lawyer Assistance Program that Nathan H. Christopher, Jr. is currently using sound judgment and is an honest, responsible, and stable member of the community; and (3) verification of monitoring by the MSBA Lawyer Assistance Program from the date of the filing of this Opinion until consideration of the motion to lift suspension by this Court of Nathan H. Christopher, Jr.'s activities during that time period.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–515(C), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST NATHAN H. CHRISTOPHER, JR.*

RAKER, Judge, dissenting, in which BATTAGLIA, Judge, joins.

There is no dispute in this case as to respondent's misconduct. The hearing judge found that respondent engaged in fraud and perjury by knowingly submitting a false accounting, and by knowingly misrepresenting the value of estate funds in the estate bank account. Respondent also violated the Rules of Professional Conduct by lacking competency and diligence, by commingling and misappropriating funds, and through certain fee issues.

It is a serious transgression for an attorney to obtain a legal fee for handling an estate matter without prior approval of the Orphans' Court. *See Attorney Griev. Comm'n v. Owrutsky,* 322 Md. 334, 344, 587 A.2d 511, 516 (1991) (stating that an attorney has no right to estate funds, "either as a commission or as an attorney's fee, unless and until an approval pursuant to § 7–601 or § 7–602 of the Estates and Trusts Article, Maryland Code (1974, 1990 Cum.Supp.) has been obtained

from the Orphans' Court"). The attorney must first file in the Orphans' Court a petition setting forth reasonable detail; the fee is subject to court approval and the court finding that the fee is "fair and reasonable" in the light of all of the circumstances. *See* Md.Code (1974, 2001 Repl. Vol., 2003 Cum. Supp.), § 7–602 of the Estates & Trusts Article. It is an even more serious violation of the Rules of Professional Conduct to misrepresent to a court and to file a false accounting. By filing a false accounting, respondent committed a fraud upon the court.

Bar Counsel maintains that the appropriate sanction in this case is disbarment. I agree. Respondent's mitigating evidence is insufficient to justify a sanction less than disbarment.

There is also no dispute that respondent suffered from physical and mental disorders, and abused alcohol. The question, with respect to sanction, is to what extent his conditions caused or contributed to his misconduct. The majority's conclusion that respondent suffered from a confused state of mind affecting his day to day practice of law and that he was not able to conform his conduct in accordance with the law is simply unsupported.

Respondent served as a panel attorney for the Office of the Public Defender and he regularly received checks from the Public Defender for his services. In fact, he earned over $50,000.00 from August, 2000 to February of 2003, and deposited eighty remittances into his account. He told Dr. Tellefsen that he performed competently as a public defender and that, to his knowledge, there were no post-conviction proceedings initiated against him. There was no evidence that Respondent failed to act appropriately as a panel public defender.

Respondent's false accounting statement which he filed in the estate proceeding was the product of his own reasoning and rationalization—that he needed more time to figure out a way to handle the issue of the depleted account and the improper fee he had taken from the estate. Respondent testified that the accounting he filed in November, 2002,

contained false figures, that he knew it was false when he signed it, and that he filed the false administration account because he needed more time. Respondent testified as follows:

"I was not well-experienced in estate administration, and this estate had become more than a simple routine matter with the death of Ms. Howard and the way the money had been handled, and I was frankly at a loss as to exactly how to deal with it. I was constantly waffling back and forth as to whether I should sell the house or transfer it in kind. And then there was the issue of the missing money. At the time I just did not understand how I was going to be able to show what had happened to it. Though, in filing the fourth account I was able to work out a process for doing that. And that was basically why I talked to the Register of Wills Gary Miller, because I wanted his expertise to give me some guidance as to how to resolve the estate."

I do not suggest that depression, alcohol abuse, and physical maladies did not cause or contribute to respondent's incompetency or lack of diligence. But to say that his condition *caused* him to file the false estate accounting or to commingle funds or to take a fee before court authorization is to misstate or misread the record. Alcoholism or other health and mental problems may justify a sanction less than disbarment when those conditions are the "root causes," of the misconduct, *i.e.* are responsible for the misconduct. The record does not support respondent's position that the root causes of the serious misconduct were his mental and physical conditions. The fact that respondent's behavior and "the failure to perform his obligations, the procrastination, the neglect, [are] behaviors *that are consistent* with depression and alcoholism" is insufficient to establish that his condition was the root cause of all of his serious misconduct. It is simply hard to believe that respondent could not conform his conduct in accordance with the law and the Rules of Professional Conduct in only one area of the law, but that he was able to do so as a public defender in over eighty matters. Additionally, based on his own testimony, I believe he recognized that money was miss-

ing from the estate and he intentionally filed the false accounting to buy additional time.

This Court has said over and over again that the purpose of attorney discipline and sanctions is to protect the public. *See, e.g., Attorney Grievance v. Mininsohn*, 380 Md. 536, 571, 846 A.2d 353, 374 (2004). In *Attorney Grievance v. Vanderlinde*, 364 Md. 376, 413–14, 773 A.2d 463, 470 (2001), we discussed the type of circumstances sufficient to mitigate against disbarment in cases involving misappropriation and fraud. We stated as follows:

> "Accordingly, we reiterate once again the position we announced in *Kenney*.[1] Moreover, we expound upon it by holding that, in cases of intentional dishonesty, misappropriation cases, fraud, stealing, serious criminal conduct and the like, we will not accept, as 'compelling extenuating circumstances,' anything less than the most serious and utterly debilitating mental and physical health conditions, arising from any source that is the 'root cause' of the misconduct *and* that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the MRPC. Only if the circumstances are that compelling, will we even consider imposing less than the most severe sanction of disbarment in cases of . . . the intentional misappropriation of funds. . . ."

Disbarment is the appropriate sanction in this case. This is in line with the American Bar Association Standards for Imposing Lawyer Sanctions (1986). Standard 5.11 provides that:

> "Disbarment is generally appropriate when:
>
> (a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an

---

1. *Attorney Griev. Comm'n v. Kenney,* 339 Md. 578, 664 A.2d 854 (1995).

attempt or conspiracy or solicitation of another to commit any of these offenses; or

(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice."

Respondent engaged in fraud, dishonesty and deceit that seriously adversely reflects on his fitness to practice law.

I am not unsympathetic to respondent's mental and physical condition. Nonetheless, the public needs protection. Dr. Tellefsen testified that respondent has suffered from depression his entire life; that his depression was intensified and complicated by his drinking which started fifteen or twenty years ago; and that his current condition today is precarious. Moreover, it appears that respondent is not receiving any psychotherapy. The conditions imposed by this Court as a predicate for reinstatement are unrealistic. How can the MSBA Lawyer Assistance Program certify that respondent is an honest member of the community? How can the program certify that respondent is responsible and stable? How is the Lawyer Assistance Program supposed to discharge its "monitoring" of respondent during his period of suspension? The Lawyer Assistance Program of the Maryland State Bar Association is one of the best programs in the country, but its resources are limited. This Court should not impose such an obligation of the program. If, and when, respondent is sufficiently recovered to practice law without jeopardizing the public, he can apply for reinstatement.

The burden is on respondent to demonstrate that a sanction less than disbarment is appropriate. He has failed to do so and should be disbarred.

Judge BATTAGLIA has authorized me to state that she joins in this dissenting opinion.