876 A.2d 664

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Robert Joel ZAKROFF.

Misc. Docket AG No. 19, Sept. Term, 2003.

Court of Appeals of Maryland.

June 23, 2005.

---

604

Delores O. Ridgell, Asst. Bar Counsel (Melvin Hirshman, Bar Counsel, Atty. Grievance Com'n of MD), for Petitioner.

Barry H. Helfand, Rockville, for Respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, Judge.

Pursuant to Maryland Rule 16–751 [1] of the Maryland Rules of Professional Conduct (MRPC), the Attorney Grievance Commission (petitioner), acting through Bar Counsel, filed a petition for disciplinary or remedial action against Robert Joel Zakroff (respondent). The petition alleges that respondent violated Maryland Rule 1.3 (Diligence); [2] 1.15(a), (b), (c) (Safekeeping Property); [3] 3.3 (Candor Toward the Tribunal); [4] and

---

1. Maryland Rule 16–751, as relevant, provides:
 (a) Commencement of disciplinary or remedial action.
 (1) Upon approval of the Commission. Upon approval or direction of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals.

2. Rule 1.3 provides as follows:
 A lawyer shall act with reasonable diligence and promptness in representing a client.

3. Rule 1.15 provides as follows:
 (a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
 (b)Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.
 (c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

4. Rule 3.3(a) provides in relevant part:

8.4(a), (b), (c), (d) (Misconduct)[5] of the MRPC, Md.Code (1989, 1995 Repl.Vol.); §§ 10–306 (Misuse of Trust Money)[6] and 10–606(b) (Penalties)[7] of the Bus. Occ. Prof. Article; and Md. Rule §§ 16–607[8] and 16–609.[9]

---

(a) A lawyer shall not knowingly:

(1) make a false statement of material fact or law to a tribunal

**5.** Rule 8.4. Misconduct.

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

\* \* \* \*

**6.** Md.Code Ann., Bus. Occ. & Prof. Art section 10–306 provides:

A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer.

**7.** Md.Code Ann., Bus. Occ. & Prof. Art section 10–606(b) provides:

(b) A person who willfully violates any provision of Subtitle 3, Part I of [the Bus. Occ. and Prof. Art.], except for the requirement that a lawyer deposit trust moneys in an attorney trust account for charitable purposes under § 10–303 of [the Bus. Occ. and Prof. Art.], is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $5,000 or imprisonment not exceeding 5 years or both.

**8.** Maryland Rule 16–607 provides in part:

a. General prohibition. An attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account by Rule 16–604 or permitted to be so deposited by section b. of this Rule.

b. Exceptions.

\* \* \*

2. An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the attorney withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved.

**9.** Maryland Rule 16–609 provides in part:

An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any

Pursuant to Maryland Rule 16–752(a),[10] we referred the matter to Judge Durke G. Thompson of the Circuit Court for Montgomery County to make findings of fact and conclusions of law in accordance with Maryland Rule 16–757(c).[11] Following an evidentiary hearing, Judge Thompson found that respondent violated MRPC Rules 8.4(a), (b), (c), (d), 1.15(a), (b), 3.3(a) and BOP §§ 10–306 and 10–606, but concluded that respondent did not violate Rule 1.3. Respondent and petitioner filed exceptions to Judge Thompson's findings.

## I.

After an evidentiary hearing, Judge Thompson made the following factual findings and conclusions of law:

### ·"FINDINGS OF FACT AND CONCLUSIONS OF LAW

"By order of the Court of Appeals of Maryland dated July 29, 2003, pursuant to Maryland Rule 16–752(a), the Petition for Disciplinary or Remedial Action in this matter was transmitted to this Court for determination of findings of

---

funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer.

10. Rule 16–752(a) provides:

(a) Order. Upon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a judge of any circuit court to hear the action and the clerk responsible for maintaining the record. The order of designation shall require the judge, after consultation with Bar Counsel and the attorney, to enter a scheduling order defining the extent of discovery and setting dates for the completion of discovery, filing of motions, and hearing.

11. Maryland rule 16–757(c) provides:

(c) Findings and conclusions. The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law. If dictated into the record, the statement shall be promptly transcribed. Unless the time is extended by the Court of Appeals, the written or transcribed statement shall be filed with the clerk responsible for the record no later than 45 days after the conclusion of the hearing. The clerk shall mail a copy of the statement to each party.

facts and conclusions of law. After an extension of time granted by the Court of Appeals, this Court heard evidence on May 17–19, 2004; July 15, 2004; and September 13, 2004, and final arguments on October 27, 2004.

## I. *The Allegations.*

"In this matter, the Attorney Grievance Commission alleges that the Respondent, Robert Zakroff violated Rules 1.3, 1.15(a), (b), (c), 8.4(a), (b), (c), (d), Md.Code Ann., Bus. Occ. Prof. §§ 10–306 and 10–606, and Maryland Rules § 16–607 and § 16–609.

## II. *Findings of Fact.*

"Upon the testimony heard and the exhibits admitted, this Court, by clear and convincing evidence, makes the following findings of fact:

"1. The Respondent was admitted to the practice of law on June 21, 1973.

"2. The Respondent was also admitted to the Bar of the District of Columbia in 1973 and to the Bar of the State of Virginia in 1986.

"3. During the period 1986 to the present, the Respondent maintained an office for the practice of law in the State of Maryland in Bethesda, Maryland under the practice name of Zakroff & Associates, P.C. with concentrations in personal injury, bankruptcy, and collection matters.

"4. The Respondent was the sole stockholder of Zakroff & Associates, P.C., but employed both professional and non-professional staff and associates.

"5. When a client retained the firm for representation in a personal injury matter, it was the policy of the firm to require a retainer agreement to be signed. This retainer agreement granted to the Respondent and other attorneys in the firm a power of attorney to negotiate checks or drafts paid in satisfaction of personal injury claims.

"6. Once a case was ripe for resolution, the Respondent or other attorneys would negotiate with the tortfeasor's repre-

sentative and obtain a commitment to a settlement of the client's claim.

"7. The Respondent met regularly with members of his staff to discuss the status of personal injury cases and their actual or potential resolution.

"8. When a personal injury case was settled and the firm received settlement proceeds, a photocopied record of the check was made and kept in the file. The check was deposited in the firm's required trust account by using the power of attorney to endorse on behalf of the client.

"9. Clients were generally not notified when a settlement check was received, but if a client called and inquired about the status of settlement, the client would be told that a settlement had been reached. The amount of time between the receipt of settlement proceeds and informing the client of the payment varied from matter to matter.

"10. As necessary, the Respondent determined when a settlement statement containing amounts received, amounts payable to the client and medical care providers, as well as reimbursement of costs and expenses advanced by the law firm would be prepared for the client. The Respondent, other attorneys, or certain staff then presented the settlement statement to the client, and the client was asked to sign to show approval. No information was provided to the client as to the date of the actual receipt of the settlement proceeds by the law firm.

"11. The Respondent employed Deborah MacDonald from September 1996 until December 2001. Her duties included handling the personal injury files for the law firm. Mac-Donald supervised other clerical employees in connection [with] the management of the personal injury files. Mac-Donald was a fulltime employee, except for a period from June 1999 through February 2000. MacDonald and the Respondent regularly met to discuss the status of personal injury files. On occasion, MacDonald would make deposits of personal injury checks and drafts, but this was generally the function of the law firm bookkeeper. MacDonald was able to retrieve for the Respondent those personal injury

files, as needed which had been created after she began her employment with the law firm.

"12. The personal injury files contained information about the case including, *inter alia,* information about the receipt of funds, a photocopy of the check, and deposit slips of the amount put into the escrow account.

"13. The escrow account checks were kept in a binder in the Respondent's office. MacDonald prepared the disbursement checks by completing the date, the amount, and the name of the payee. Sometimes the Respondent or other employees of the law firm would prepare checks, but only the Respondent could sign checks.

"14. On several occasions, MacDonald prepared checks for disbursement and presented the checks to the Respondent for his signature, but the Respondent failed to sign them. On other occasions, the checks would not be signed for periods of six months or more, causing MacDonald to have to prepare new checks for disbursement.

"15. It was the practice of the Respondent and his law firm to provide Assignment and Authorization forms to medical care providers involved in the treatment of a client in a personal injury case. Records of the assignment were kept in the clients' files.

"16. It was a common practice for the members of the law firm, principally MacDonald, to undertake a negotiation with medical care providers in an effort to reduce medical charges that were subject to the assignment and authorization. When such reductions were agreed upon by the provider, this information was entered in the settlement sheet and the benefit was given to the client. MacDonald negotiated on a number of occasions with Phillips & Green, an orthopedic practice treating some of the firm's clients. MacDonald would receive telephone inquiries from representatives of Phillips & Green several times a week, regarding the receipt of proceeds by the law firm for medical services provided to the client, for which the law firm had received an assignment and authorization form. Upon inquiry to the Respondent on how to respond to these calls,

the Respondent would either authorize or not authorize the disbursement of funds. On some occasions, the Respondent instructed MacDonald to tell Phillips & Green that a case had not settled when, in fact, settlement proceeds had been received. MacDonald followed these instructions and the Respondent was aware that MacDonald was giving false information. Such communications with Phillips & Green occurred on more than twenty occasions.

"17. MacDonald also carried on communications with the Washington Orthopedic Group, another medical provider to the law firm's personal injury clients. As with Phillips & Green, MacDonald, acting in accordance with the Respondent's instructions, gave false and misleading information to Washington Orthopedic Group personnel about whether cases in which they were involved had settled. In some cases, more than a year passed from the time of the receipt of the settlement funds to the date of disbursement to Washington Orthopedic.

"18. MacDonald became aware that the balance in the escrow account was low and there did not appear to be sufficient funds to cover the obligations due from the account. She informed the Respondent about this belief and Respondent neither confirmed nor denied this status.

"19. MacDonald also received calls from the clients of the firm about the settlement of their cases. As with the medical providers, the Respondent told MacDonald to provide the client with misleading information, which instruction MacDonald followed.

"20. MacDonald wrote approximately 25% of the checks disbursing fees to the law firm, which were deposited from the escrow account into the firm checking account with Sun Trust. In the other approximately 75% of the cases, when MacDonald wrote the disbursement checks, the Respondent advised her that he had already paid the firm from the escrowed proceeds. Prior to such disbursements, the Respondent did not ask MacDonald to confirm that monies were owed the firm from the escrow account, nor did Respondent check records.

"21. The clients were aware that the firm was seeking a reduction in the amounts that medical providers were charging the clients. Some providers did not promptly respond and in some cases the clients disputed the amounts claimed as owed by the medical providers. Other delays in disbursements were caused by efforts to obtain payment from health insurers.

"22. Leslie Swartzwelder, sister of MacDonald, was an employee of the firm from 1998 until early 2001. Although not being trained as a bookkeeper, Swartzwelder performed this function during her tenure. The books of the firm were kept in a safe in Respondent's office. The firm had five bank accounts in two banks, Sun Trust and Provident. The checkbook for the escrow account utilized stubs on which the name of the payee, the amount of the check and the date was entered. Swartzwelder used her computer system and bank statements to reconcile the bank accounts. During this process, Swartzwelder discovered that the former bookkeeper had written unauthorized checks.

"23. Among the duties of Swartzwelder was the payment of accounts payable. Since she had no check signing authority, Swartzwelder would prepare the check payable and attach the invoice and leave them for the Respondent to sign. On occasion, only with Respondent's approval, she would use a stamp bearing Respondent's signature on a check. During her employment, Swartzwelder would receive telephone calls from the banks indicating that an account was low which would prompt her to contact the Respondent. The Respondent would direct her to draw monies from certain accounts and pay them into the accounts that were low. This was usually done in person, however, on occasion Swartzwelder would endorse the checks by means of the stamped signature over the telephone. Swartzwelder prepared checks numbered 2049, 2053, and 2066 through 2070 and was instructed by the Respondent to deposit these checks from the escrow account to the regular checking or other accounts. The Respondent did not ask Swartzwelder to check files or

balances when such transfers were made, or tell her that the withdrawals from the escrow account were due [to] an entitlement to a fee. Swartzwelder was aware that the Respondent was depositing personal funds in the escrow account from time to time because it was necessary for her to record the transaction.

"24. At all times relevant, the Respondent had full and complete access to the financial records of the escrow [account], other accounts, and the books of the firm.

"25. In response to a complaint received by Petitioner's office, an investigator of the Petitioner's office, John De-Bone, performed a spot audit of Respondent's books. The spot audit began on May 8, 2002 and included an inspection and audit of the attorney trust (escrow) account used for personal injury cases held at Sun Trust, formerly Crestar Bank. The Respondent, with the exception of one case file, produced all records requested by DeBone. The materials produced included a receipts journal that reflected deposits made to the trust account. Using an acceptable methodology, DeBone calculated that on January 4, 2002, the trust account should have contained at least $59,000.00 owed to five separate clients, but that the balance of the account on that date was $4,341.54. Among the deposits evidenced by the receipts journal were two deposits made by the Respondent from personal funds. Respondent claimed that the deposits were for payment of payroll and expenses and that the money would be passed through the trust account and into the payroll account and then paid out. Respondent indicated to DeBone that he made such deposits five or six times a year.

"26. During the spot audit examination period, notwithstanding the deposit of $60,000.00 from personal accounts and a $15,000.00 check for fees, the audit revealed a shortfall of approximately $54,000.00 in the account.

"27. As a result of the spot audit, DeBone requested bank records for the years 2000, 2001 and part of 2002 from which he prepared an analysis for the period from January 2, 2000 through July 31, 2002. During the larger audit

period, DeBone discovered that the trust had a short fall ranging from a low of $174,000.00 to a high of approximately $421,000.00.

"28. DeBone also calculated the length of time between deposits of settlement proceeds and disbursement to third parties and clients. In twenty-four cases the time difference was more than six months; in seventeen cases the delay was more than twelve months. Additionally in the *Mohalyi* case the delay was eighteen months; in the *Biscoe* case it was sixteen months; and in one case, *Bowers*, settlement funds had been received on September 5, 2000 and had not yet been disbursed as of July 31, 2002.

"29. DeBone examined the Alicia Czorny case. *Czorny* was a personal injury case, which was settled. Proceeds had been received prior to January 3, 2000. The settlement statement prepared for the case bears Czorny's signature dated April 26.2000. Sums shown on the settlement statement as payable to third parties were not paid until March 16, 2001 and June 27, 2001. The trust balance on May 11, 2000, following the disbursement of Czorny's share of the settlement proceeds was $673.56.

"30. The Respondent deposited sums from his personal funds into the trust account, including the proceeds from a life insurance loan in the amount of $80,000.00, which was deposited on January 29, 2002, as well as sums from a Fidelity Investment account in the joint name of the Respondent and his wife. Four of the deposits made by the Respondent from personal funds occurred after the beginning of the Petitioner's investigation in March 2002. The personal funds deposited were necessary in order to clear checks written in disbursement of the *Czorny, Hohalyi, Briscoe* and *Mitchell* cases. If the deposits had not been made, there would have been inadequate funding of the checks.

"31. Petitioner's investigation revealed that the balance of the trust account on May 11, 2000 was $673.56 On May 12, 2000, a settlement of the *Diaz* case resulted in the deposit of $22,600.00. The Respondent disbursed $9,500.00 to four

other clients utilizing the monies received from the *Diaz* settlement causing insufficient funds to be available to satisfy the needs for the *Diaz* disbursement.

"32. The pattern of the Respondent was to withdraw from the trust account lump sums payable to Zakroff & Associates. Only rarely did the withdrawals represent sums properly earned as fees and costs advanced.

"33. The financial pattern examined by the Petitioner's investigator, DeBone, shows that other accounts utilized by the Respondent for a variety of functions including his bankruptcy and collection practice, trust account, management of the law firm account, and the mortgage account all showed negative balances on frequent occasions.

"34. The Respondent was the sole signatory on all office accounts. Before disbursements could be made in cases handled by associates, the Respondent had to authorize the disbursement.

"35. One associate of the firm, Jonathan Silverman, noticed the banking irregularities, but did not question them. Silverman was entitled to a portion of the fee earned from cases on which he worked. Sometimes the fee portion was paid to Silverman before the case settled, or long afterwards. Silverman also represented the firm in negotiations with Washington Orthopedic Group for the extended payout of monies due to that organization for which immediate funds were not available in order to satisfy the law firm's obligations.

"36. There was a pattern of long delay in the management of monies legitimately due to the medical providers. While some of the delay is accountable to a variety of possibilities, the pattern of delay together with the established balances in the trust account, demonstrate that the Respondent, who was the sole signatory for the accounts of the firm, knew there were insufficient balances to satisfy clients, medical and third party service providers because the Respondent had withdrawn money from the trust account and paid it into the firm business accounts in order to satisfy financial needs. The reason for the financial needs was, in part, due

to the appropriation of monies from the business accounts to the Respondent personally.

"37. During the period 1999–2000, the Respondent encountered marital problems, which led to the Respondent seeking therapy for those problems. The Respondent consulted with Linda Hurwitz, L.C.S.W. on the marital problems for approximately eighteen months during which time he was prescribed and began to take Zoloft. When Hurwitz first consulted with the Respondent, she noted some depression effects, which he denied, and suggested medication, which the Respondent declined to take. Hurwitz also diagnosed the Respondent as having a personality disorder which she believed was very self destructive and masochistic. Hurwitz's current diagnosis is that Respondent was more than mildly depressed. Respondent rarely brought up work issues with Hurwitz during his therapy, but his wife regularly complained about his office. To the extent opinions were expressed by Hurwitz, she concluded that the Respondent felt abused by his employees and that he felt compelled to forge ahead with work, no matter the obstacles. This tendency she referred to as the "Superman Complex." It is Hurwitz's belief that his depression interfered with Respondent's ability to think clearly and the depression interfered with the analysis of whether taking money from the trust account was more than a means to an end of solving some immediate problem. She opined that the Respondent did not think in terms of using the trust account monies as a wrongful act and had no opinion whether Respondent knew that taking monies was wrongful.

"38. The Respondent had experienced a dysfunctional family upbringing. His father raised him in Philadelphia with his brother and sister. The Respondent's mother died from cancer when the Respondent was quite young. The Respondent thought highly of his father and describes him as unique, but his father was abusive to Respondent and his older brother, who, in turn, was abusive to Respondent. Respondent also describes his father as a depressed individual who would literally ship the Respondent off to camp,

sometimes prematurely, during the summer months when the Respondent was age three until he was eighteen.

"39. The Respondent succeeded in school, but by the time he reached college, he reports that he suffered blackout spells and, on one occasion, the dizzy spells and disorientation lasted through the finals period.

"40. Respondent married his childhood sweetheart, but the marriage has had its turmoil. Respondent's daughter was apparently suffering depression and became a recluse in the family home. Respondent's wife blamed him for the situation and it triggered marital problems. This caused the Respondent to seek counseling. Because his wife is a trained "healer" utilizing holistic treatment for ills, the Respondent initially eschewed medication.

"41. The Respondent, who had served as a U.S. Bankruptcy Court trustee for a period from shortly after being admitted to the bar, decided in 1984 to move his office to a detached house and to begin to specialize in personal injury claims. At the time of the instant hearing, the Respondent described his practice as involving collections, bankruptcy and personal injury cases. The volume of cases was approximately 250 bankruptcy, 320–400 personal injury, and 1500–2000 collection matters. The law firm grossed $890,000.00 in 1999, $960,000.00 in 2000, and $1,020,000.00 in 2001, with a drop of income in 2002. The Respondent operated his practice with a high degree of delegation, but was constantly troubled by the inability to retain staff and associate attorneys. By his account, the Respondent believes he has hired approximately forty associate attorneys over the years. The Respondent paints a picture of the practice as a chaotic affair with periodic crises occurring into which he was required to become enmeshed. The Respondent assigns as reasons for his practice being in such a state to his own depression and his unwillingness to disappoint potential clients causing him to take on improvident cases. Respondent also felt victimized by a bookkeeper who stole $20,000.00 from him. Respondent asserts he never intended nor did he steal any monies from any client.

He states that everyone who is due any monies have been paid in full. The Respondent owns the house from which the firm practices jointly with his wife and the mortgage on the house is serviced by a dedicated account at Sun Trust.

"42. The Respondent states that he rarely failed to go to the office and put in long hours described as seventy to eighty hours per week. For recreation, the Respondent played tennis and ran. He describes exercise as therapeutic, allowing him to focus on practice matters. He kept all trial and court dates.

"43. The Respondent does not deny the status of his trust account, but pleads ignorance to the precise balances and believed there were sufficient monies to cover the checks he directed his subordinates to write. He acknowledges depositing $40,000.00 of personal monies to fund the *Czorny* settlement. He professes ignorance of deposits of other personal funds, which is not credible. He also claimed to be ignorant of the minimal balance of approximately $600 in the trust account, which is also not a credible statement. The Respondent made no effort to audit his trust account until after the Petitioner's investigation had commenced. Only then, he asserts, did he know of the deficiencies in the trust account. Additionally, this assertion is not credible.

"44. Evidence was presented on the Wardley Patterson matter. Wardley Patterson was a former client of the Respondent. In April 2000, Patterson consulted the Respondent about filing for bankruptcy.

"45. Shortly thereafter, in May 2000, Patterson's home was sold at foreclosure sale. In early July 2000, Jonathan Silverman, Esq., as associate attorney with the Respondent's firm, filed exceptions to the Report of Sale on behalf of Patterson. On this matter, the firm was unsuccessful and the exceptions were denied.

"46. In October, Patterson returned to the Respondent's offices and met again with Silverman and complained that the promised bankruptcy filing had not occurred.

"47. In November 2000, Patterson was in dire financial straits, and with the assistance of the Respondent's firm, filed for bankruptcy. Jonathan Silverman, Esq. was the attorney of record for the firm. Silverman testified that he did not know of the *Little* agreement. Patterson was difficult to understand because of the level of medication he was taking.

"48. At the October meeting with Silverman, the Respondent was not present nor in the offices. However, there was a file from the previous meeting between Patterson and the Respondent containing rudimentary schedules for filing bankruptcy. Silverman briefly discussed these schedules with Patterson.

"49. Subsequently, Patterson returned to the offices and signed the schedules in early November 2000.

"50. Patterson also had an arrangement entered upon with the assistance of the Respondent where Patterson was to care for another individual by the name of Little in return for the use of a residence and payment of cash monies. Little died on November 18, 2000. Patterson was no longer paid what he felt was due to him and he wanted to make a claim against the estate. By letter dated December 7, 2000, Respondent wrote to the attorney for the estate, Richard Chisholm, Esq. demanding payment for services rendered in the amount of $6,000 per month plus a lump sum of $50,000.00.

"51. At a meeting of creditors, under § 341 of the U.S. Bankruptcy Code, which was attended by Patterson and Joseph Langone, Esq., who was an associate attorney of the Respondent, the required schedules were presented to Patterson, with his daughter present, for Patterson's signature. Langone attended the meeting at the request of the Respondent who was otherwise occupied on another matter. The claim of Patterson for services provided was not included within the schedule of assets belonging to Patterson. At the § 341 meeting, the bankruptcy trustee, Cheryl Rose, was critical of the manner in which the schedules were prepared and chastised Langone who did not know answers

on specific matters. Rose testified that she specifically asked whether Patterson, as a debtor, had claims against anyone else.

"52. After the meeting, Langone inquired about the Little Estate claim and was reassured by Respondent that it was not a problem.

"53. Rose made a trustee's report on the matter. The case proceeded to discharge on February 21, 2001 and closed with notices sent of the court's actions.

"54. Silverman testified that he received a call from an associate of Richard Chisholm, Esq. who sought the return of keys to the Little residence. It was during this dialogue that Silverman learned of the claim upon the Little estate being made by Patterson.

"55. On March 5, 2001, Chisholm called Silverman. He was already aware of the claim against the Little estate from other conversations and advised Silverman. After the phone call, Silverman conferred with the Respondent on the matter.

"56. Negotiations then proceeded with the Respondent demanding from the estate on behalf of Patterson a cash payment of $40,000.00 to settle the matter and the claim. This negotiation never came to fruition and suit was filed to enforce the agreement on May 16, 2001.

"57. Chisholm and Silverman called to advise Rose of the claim against the Little estate. Ultimately the bankruptcy case was reopened and Rose took over the claim against the estate and settled it for $20,000.00, which was significantly less than the amount for which the Respondent believed he could settle the case. Rose felt that the case was weak because of the potential application of the Dead Man's Statute and because Patterson would make a poor witness. By this time, Patterson had retained counsel other than the Respondent.

"58. Ultimately, the bankruptcy court sanctioned the Respondent for the improper claim of an exemption and filing a frivolous motion. The exemption claim used by the Re-

spondent was for pain and suffering caused by the breach of contract. Eventually, Respondent paid $47,000.00 in settlement with Wardley Patterson, $1000.00 in sanctions, which when coupled with the recovery of $20,000.00 against the Little estate, resulted in a 98% recovery on claims of creditor in the Patterson bankruptcy. The sanctions in the matter were visited upon the Respondent and not on the firm. The entire matter was referred to the Petitioner for investigation.

"59. After Petitioner's investigation was commenced, several mental health professionals saw Respondent. Kristin Tellefsen, M.D. was asked by Respondent's former counsel to evaluate Respondent in September 2002. Dr. Tellefsen is a highly experienced psychiatrist who has had 30–40 testimonial opportunities in attorney discipline matters. She is also the former director of the Clifton T. Perkins State Hospital and is boarded in forensic psychiatry. At the time of the examination, no petition had yet been filed and Dr. Tellefsen was not familiar with any allegations of wrongful conduct. Dr. Tellefsen found the Respondent to be under a mood disorder, depression with elements of mania and that the conditions were static for the entire adult life of the Respondent. She also found a personality disorder that was persistent, permanent, and consistent. The Respondent was seen to be dependent and avoidant in a passive-aggressive manner coupled with a self-defeating masochism. Physically, the Respondent was evidencing depression and some attention deficit. Dr. Tellefsen opined that Respondent walled off problems, which was a reflection of his relational problems that existed his entire life. As a result, Respondent tended to not pay attention to problems until they became a crisis and then Respondent provided a quick fix but did not address the root of the problem. Notably, Dr. Tellefsen opined that there was no deliberate intent to violate rules, but only to cope. Respondent probably knew that taking the trust monies for his own use was wrong and that he felt badly about it. This dynamic only created more stress and more depression.

"60. Michael K. Spodak, M.D., a forensic psychiatrist trained at Johns Hopkins University and who spent fifteen years working at the Perkins Hospital, also examined the Respondent. Dr. Spodak focused on symptoms, which were numerous. Dr. Spodak identified disorganization, sleeplessness, irritability, stress, detachment, lack of emotion, procrastination, dishevelment, late payment of bills, expenditure of $40,000 for a pool to please his wife and then burying it, selling property at a loss, too much work, bad employees, late taxes, and the refusal to confront his daughter about remaining reclusive in the house. Dr. Spodak noted that the mental difficulties evidenced themselves in everyday life and not just in his practice. Dr. Spodak believed there was a debilitative mental condition that was the cause of the conduct in the allegations facing the Respondent. Dr. Spodak does not believe that the Respondent intended to steal money and his acts were not a total moral breakdown. Rather, Respondent wanted to help clients and others. Financially, Respondent did not need the money from the trust account because he had sufficient monies for his needs. Dr. Spodak also felt that the Respondent had the ability to control his behavior, even though it was somewhat impaired. In essence, the Respondent's depression caused the Respondent to not care about consequences and to not consider ethical responsibilities, although he did not let everything go to pieces. Dr. Spodak was in agreement with Dr. Tellefsen that the Respondent utilized quick fixes to meet his crises.

"61. [Jeffrey S.] Janofsky, M.D., also a forensic psychiatrist, who had the benefit of the views of the other mental health professionals as part of the assessment workup, also examined the Respondent at the request of the Petitioner. Janofsky agrees that the Respondent suffers from depression, which is both a symptom and diagnosis. However, Janofsky disagrees in the severity and impairment caused by the depression. Janofsky believes it was much less than a major depression. Janofsky also agrees that the Respondent suffers from a mood disorder that was probably caused by his childhood and rearing. He believes that the mood

disorder is persistent, consistent and permanent, but that the mood disorder did not cause the Respondent to commit unethical acts. In support of this view, Janofsky cites to the Respondent's ability to restore the trust account by repayment, develop a methodology to cover shortages in the trust account, and undertook a determined assault on the medical insurers and medical providers for his clients. Janofsky acknowledges that the circumstances of the Respondent during the subject time period was stressful, anxiety producing, depressing, and the cause of physical symptoms. Finally, Janofsky believes that the Respondent is much improved as a result of the Zoloft prescription and is grateful to be relieved of the worry and anxiety of his bank accounts.

"62. It was stipulated by the parties that the Respondent was seen and counseled by Carol Waldhauser of the Maryland State Bar Association Lawyer Assistance Program. The contact with the program began after Petitioner undertook its investigation.

"63. In sum total, taking into account all of the testimony of the forensic psychiatrists and Hurwitz's testimony, it is clear that the Respondent has been suffering from a mood disorder all his life. Additionally, the Respondent suffered from significant depression and the depression affected both his personal and professional relationships and lifestyle. The depression interfered with Respondent's ability to think through the problems he perceived were plaguing him and to develop acceptable solutions and to implement them. As a result, Respondent was crisis driven which caused him to abuse his trust account and utilize monies deposited therein for others for his personal use. Respondent took these actions in a determined and knowing manner, but without real need and without malice toward clients or with intent to steal. The sheer magnitude of the imbalance of the trust account, the repeated conduct of drawing upon it, the methodology used by the Respondent, and his apparent appreciation of the wrongfulness, albeit rationalized away contradicts his claims of ignorance. The Respondent placed the

property of others at significant risk even though no client or medical assignee experienced any actual loss.

"64. The Respondent testified to several remedial actions undertaken in the operation of his practice. As mentioned above, the Respondent is now taking medication for depression and has consulted with the M.S.B.A. Lawyer Assistance Program. Evidence was also received that Respondent would submit to a monitor of his practice by Alan Feld, Esq. Mr. Feld is known to the Court as an attorney in good standing and sound reputation with experience, competence and a successful law practice. This Court finds that Mr. Feld is fully capable of monitoring Respondent's practice if properly compensated for his time and if he is given full access to Respondent's practice.

"65. Respondent testified that Mark Shupe, Esq. had agreed to mentor the Respondent on ethical issues that he might confront in the future. Mr. Shupe is an attorney of good standing and of sound reputation and is capable of assisting the Respondent on the resolution of ethical issues.

### III. *Conclusions of Law.*

### *Management of Trust Account*

"In regards to the alleged violations of statutory provisions in the handling of trust funds by the Respondent, this Court concludes:

### *BOP §§ 10–306 and 10–606*

"BOP §§ 10–306 and 10–606 provide that a lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer. There is clear and convincing evidence that the Respondent knowingly used client funds for unauthorized purposes. This finding is based on the factual finding that the trust balances fell far below that necessary to protect and safeguard client funds. Respondent, by his pattern of conduct, knew that there were insufficient monies in the trust account, but persisted in taking the monies for his personal

use. Respondent withdrew for his use, funds, which he eventually repaid from personal funds. These actions were undertaken by the Respondent who committed the acts willfully and knew they were wrongful.

"It is not necessary to recount all of the instances contained within the record that demonstrate the actions of the Respondent. In fact, he does not deny his actions, but asserts the violations were not willful due to his ignorance of account balances. This position is belied by the Respondent's careful methodology and his sole control over the funds in question.[12] As stated above, this Court concludes that the testimony of the Respondent on this point is not credible and that he was well aware of what occurred at the firm. What is credible is that clients and other third parties demanding payment confronted the Respondent periodically. The reason these demands created a crisis was because the funds necessary had been previously withdrawn and used by the Respondent for unauthorized purposes.

"The fact that these monies were eventually repaid and that no one suffered a loss goes only to mitigation of the sanction for the violation of these sections of the law. *Attorney Grievance Commission v. Owrutsky*, 322 Md. 334, 351, 587 A.2d 511, 519 (1991). While it might be viewed by Respondent as conscious indifference to the management of his trust account, this Court concludes that his actions were understood and purposeful. By clear and convincing evidence, this Court finds the Respondent to be in violation of these statutes.

---

**12.** The arrangement utilized by the law firm of including a power of attorney from the client for the deposit of settlement proceeds is a highly questionable practice. It materially facilitated the abuses occurring in numerous matters under the Respondent's control. There is no specific allegation in this case that such an arrangement is unethical and in violation of the Rule of Professional Conduct, but it is without question that if clients had known on a timely basis that a recovery had been received in their case, the delay in disbursement to the client would have been more timely and the Respondent would not have been able to use the funds for his own purposes. Of course, the same result would not necessarily pertain to monies deliberately not paid to medical assignees.

*Maryland Rules of Professional Conduct*
*8.4(a)(b)(c) and (d).*

"Rule 8.4(a) requires a finding that the Respondent has violated other rules. As seen below, the Respondent is in violation of the other subsections of Rule 8.4 and thus has violated 8.4(a).

"Rule 8.4(b) is violated if it is shown that BOP § 10–306 was violated by clear and convincing evidence. Petitioner has provided an abundance of evidence in this regard and the Respondent has not rebutted it. As outlined above, the Respondent is in violation of this subsection.

"Rule 8.4(c) was violated when the Respondent misappropriated monies from his trust account and then directed others to lie about the fact. The Respondent also misrepresented to the Petitioner's investigator the use of $50,000.00 deposited into the trust account purportedly to cover payroll when, in fact, it was used to pay proceeds to a client on a personal injury matter which could not be covered by existing balances.

"The prolonged delay in paying third party assignees those monies due the assignees after a settlement was reached in a personal injury matter was also proven by clear and convincing evidence. Such conduct is prejudicial to the administration of justice. Those directly affected and others who learn of attorney conduct of this type will not cooperate with attorneys in the future, or if they do, the cooperation will require safeguards for the assignees that should not be necessary when dealing with a professional. The Respondent is in violation of this rule.

*Maryland Rule of Professional Conduct 1.15*

"Violation of this rule occurs if the balance in an attorney trust account falls below the total amounts held in trust and such deficiency does not have a satisfactory explanation. The fact that there was an insufficient balance is *prima facie* evidence of a violation. As outlined in the finding of facts, it is likely that the balance of the trust account was

insufficient for much, if not all, of the period examined by the Petitioner's investigator, DeBone.

"Subsection 1.15(a) was violated repeatedly when the Respondent commingled funds by depositing his personal funds on nineteen separate occasions from April 2000 until July 30, 2002.

"The Respondent violated subsection 1.15(b) when he directly or through those he directed, failed to promptly notify clients or other interested parties of the receipt of funds to which they were lawfully entitled. Not only was there a failure to promptly notify clients and assignees on many occasions, there was a deliberate pattern undertaken to deny the medical providers the use of their lawful monies while Respondent "kited" other settlements or supplied funds from his personal accounts to cover shortfalls. The Respondent is in violation of this rule.

### *Wardley Patterson Matter*

"The central issue in the *Patterson* case is whether the Respondent directly or indirectly attempted to circumvent the bankruptcy laws in an effort to recover monies for Patterson and for which the Respondent would earn a substantial fee. It is clear the Respondent personally discussed the claim against the Little Estate with an attorney representing the personal representative and the estate on March 5, 2001. The testimony of Richard Chisholm, Esq. about the conversation is bolstered by contemporaneous notes and is entirely credible. Respondent was also fully aware of the Patterson bankruptcy proceedings even though he did not personally handle the matter. He had referred Patterson to Silverman, but when neither could attend the § 351 meeting, it was the Respondent who directed Langone to attend. Further, Langone reported back to the Respondent on the matter. When the Respondent filed a lawsuit in an effort to recover the claimed monies for Patterson on May 17, 2001, he made no effort to notify the bankruptcy trustee, Cheryl Rose, nor did he include her in the filing. The only conclusion that can be drawn is that the

Respondent, being knowledgeable of the bankruptcy rules and laws, and knowledgeable of the Patterson Chapter 7 petition, and the period it covered, deliberately withheld information from the bankruptcy schedules, and made no effort to inform the trustee of the claim on the Little estate. The Respondent compounded his violation of the bankruptcy rules by attempting to actively recover the claim through negotiation and by filing a lawsuit. In fact, the bankruptcy court must approve such activity before counsel other than the trustee can take these actions. Undoubtedly, such a rule is designed to control costs expended in recovering assets, but it also reins in unauthorized representations.

### Maryland Rule of Professional Conduct 1.3

"The allegation that the Respondent failed to act diligently on behalf of Wardley Patterson is not supported by clear and convincing evidence. While there were initial delays in getting the bankruptcy underway, they do not rise to a level constituting a violation of Rule 1.3. Nor is there sufficient evidence that the Respondent was not diligent when he failed to amend the bankruptcy schedules, which caused the bankruptcy to be dismissed.

### Maryland Rule of Professional Conduct 3.3(a)

"This Court concludes that it was not a lack of diligence but an intentional act to omit the Little claim from the bankruptcy schedules and by doing so the Respondent violated Rule 3.3(a). This Court does not accept the testimony as credible that the Respondent's actions were taken to protect the claim on behalf of the trustee. Accordingly, the Respondent is found in violation of this rule.

### Maryland Rule of Professional Conduct 8.4(c)

"Violation of this rule requires that this Court find by clear and convincing evidence, dishonesty, fraud, deceit, or misrepresentation in the actions of the Respondent. The actions of the Respondent meet the criteria for violation of this rule and he is so found to be in violation.

*Maryland Rule of Professional Conduct 8.4(d)*

"This Court agrees with Petitioner's contention that the actions of the Respondent in the concealment of the Little estate claim from the attention of the bankruptcy trustee and his further deception of the attorneys representing the estate are actions detrimental to the administration of justice that constitute a violation of the rules. The Respondent is in violation of this rule.

*Maryland Rule of Professional Conduct 8.4(a)*

"Violation of the above stated rules constitutes a violation of Rule 8.4(a). By operation of the application of the rule, the Respondent is in violation of this rule.

*Mitigation*

"It is the belief of this Court that it is limited to making findings of fact and conclusions of law regarding the violations alleged. Mitigation is directed at the level of sanction to be imposed in the event violations of the rules have occurred. This Court has made findings of fact regarding mitigation, but believes that the application of mitigation is within the province of the Court of Appeals as the sanctioning body if these finding of facts and the resulting conclusions of law that rules and statutes have been violated."

## II. Discussion

### A. Standard of Review

Pursuant to Md. Rule 16–757(b), the Attorney Grievance Commission has the burden of proving by clear and convincing evidence the averments raised in the disciplinary petition. If any affirmative defenses, mitigation, or extenuating circumstances are alleged, the respondent is responsible for proving them by a preponderance of the evidence. Md. Rule 16–757(b).

Judge Cathell, writing for this Court, summarized our standard of review in attorney discipline matters:

This Court reviews attorney disciplinary proceedings according to the well established standard resting on the premise that "[t]his Court has original jurisdiction over attorney discipline proceedings." Furthermore, "[a]s the Court of original and complete jurisdiction for attorney disciplinary proceedings in Maryland, we conduct an independent review of the record." In our review of the record, "[t]he hearing judge's findings of fact will be accepted unless we determine that they are clearly erroneous" . . . . "[a]s to the hearing judge's conclusions of law, 'our consideration is essentially *de novo.*'"

■ *Attorney Griev. Comm'n v. Gallagher,* 371 Md. 673, 693–695, 810 A.2d 996, 1008–1009 (2002) (internal citations omitted); *see also* Md. Rule 16–759(b) entitled "Review by Court of Appeals". Clear and convincing evidence is evidence that is "'more than a mere preponderance but not beyond a reasonable doubt.'" *Gallagher,* 371 Md. at 694, 810 A.2d at 1009 (quoting *Attorney Griev. Comm'n v. Harris,* 366 Md. 376, 389, 784 A.2d 516, 523–24 (2001)).

Exceptions to the hearing judge's findings of fact and conclusions of law are governed by Md. Rule 16–759(b)(2)(B) which provides:

If exceptions are filed, the Court of Appeals shall determine whether the findings of fact have been proven by the requisite standard of proof set out in Rule 16–737(b). The Court may confine its review to the findings of fact challenged by the exceptions. The Court shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses.

Md. Rule 16–759(b)(2)(B).

## B. Respondent's Exceptions

Respondent filed 21 exceptions to the hearing judge's findings of fact and seven exceptions to the conclusions of law. In the interest of judicial economy we have combined a number of them for the purposes of responding.

Three of respondent's exceptions can be dealt with summarily. We note that the firm's professional account was located at Provident Bank, not Sun Trust. The name of the social worker who respondent sees professionally is Paulette Hurwitz, not Linda Hurwitz. Additionally, the "determined assault on the medical insurers and medical providers" that the hearing judge referred to in connection with the testimony of Jeffrey S. Janofsky, M.D. was against the liability insurance companies, not respondent's clients' insurance carriers. Respondent's exceptions to these findings of fact are sustained.

■ Respondent filed four exceptions related to the testimony of Deborah MacDonald, respondent's former paralegal. Ms. MacDonald testified that she was employed by respondent from September 1996 to December 2001. She was responsible for maintaining the personal injury files which, in addition to keeping track of the relevant paperwork, included cutting disbursement checks for respondent's signature and putting together a settlement statement when a case was settled.[13] She indicated that she would meet with respondent once a week, sometimes once every two weeks, to review the personal injury files. She was also responsible for fielding phone calls from various medical providers and clients inquiring about settlement disbursements.[14] She indicated that she would bring the phone calls to respondent's attention. Ms. MacDonald testified that she could not recall specific instructions from respondent to provide inaccurate information to Phillips & Green. When the questioning continued, however, Ms. MacDonald stated:

---

13. Ms. MacDonald testified that a settlement statement "is a break down showing the proceeds that the client obtained as settlement, deducting from that the attorney fees, the cost incurred, any outstanding medical bills that needed to be paid, and the bottom line proceeds to the client."

14. Ms. MacDonald testified that she would receive phone calls from health care providers "several times a week" in the case of provider Phillips and Green and "at least weekly" in the case of provider Greater Washington Orthopedic Group inquiring about the disbursement of settlement proceeds.

Q. Do you recall an occasion when [respondent] told you to tell Phillips and Green that the case hadn't settled?

A. Yes.

Q. All right, and in that case the settlement funds had already been received?

A. Yes.

Q. Did you ever tell Phillips and Green that a case had not settled when it had?

A. Yes.

Q. Was [respondent] aware that you were providing that information?

A. Yes.

Q. On many occasions did you provide inaccurate information about the receipt of settlement proceeds to Phillips and Green?

A. Many times.

Q. More than a dozen?

A. Yes.

Q. More than 20?

A. Yes.

* * * *

Q. Did you ever tell Greater Washington Orthopedic Group that a case had not settled when it had?

A. Yes.

Q. Why did you do that?

A. Basically to avoid further phone calls.

Q. Did [respondent] ever tell you to tell Greater Washington Orthopedic Group that the case hadn't settled when it had?

A. Not directly, no.

Q. Would you bring the calls that you were receiving from Greater Washington Orthopedic Group to [respondent's] attention?

A. Not all of them, no.

Q. Would you bring some of them to his attention?

A. Yes.

Q. Which ones would you tell [respondent] about?

A. Probably when it appeared more serious as far as their demand for payment.

Based on this testimony, we cannot say that the hearing court was clearly erroneous in finding that Ms. MacDonald gave false and misleading information to the medical providers in accordance with respondent's instructions. The testimony is clear regarding medical provider Phillips & Green because Ms. MacDonald testified that respondent told her to tell them that cases had not settled when, in fact, they had. She also testified that she provided this inaccurate information on more than 20 occasions. With regard to Greater Washington Orthopedic Group, we find that, although Ms. MacDonald testified that respondent did not "directly" instruct her to tell them that cases had not settled when they had, respondent was aware of the repeated inquiries and that Ms. MacDonald was dealing with Greater Washington in the same manner that respondent had instructed her to deal with Phillips & Green. Ms. MacDonald's testimony established that it was a pattern and practice in the office to mislead medical providers who called to inquire about the status of settled cases. It was not, therefore, error for the hearing judge to find that Ms. MacDonald provided false and misleading information to medical providers in accordance with respondent's instructions. Respondent's first and second exceptions are overruled.

■ Respondent also excepts to the court's finding that Ms. MacDonald had informed respondent that there were insufficient funds in the Trust account. At the hearing, Ms. MacDonald initially testified that she had not had any conversations with respondent regarding the balance of the Trust account. However, when confronted with her prior deposition testimony, Ms. MacDonald recanted and adopted her deposition testimony. When asked if she remembered her answer to the question at the deposition, "[d]id you ever tell him, meaning [respondent], that you knew that the payments were not being made because there wasn't money in the trust ac-

count?," Ms. MacDonald answered, "I believe I answered yes." Additionally, when asked if her deposition testimony was accurate and truthful she answered, "yes." As we have repeatedly stated and the Rules provide, we "shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses." Md. Rule 16–759(b)(2)(B). The hearing judge credited Ms. MacDonald's re-adopted deposition testimony that she had confronted respondent regarding the Trust balance as more credible than her initial testimony at the hearing. We overrule respondent's third exception.

Respondent's fourth exception is to the hearing judge's finding that respondent told Ms. MacDonald to mislead clients regarding settlement of their cases. Ms. MacDonald testified that she received calls several times a week from clients inquiring about settlements. She indicated that normally she would bring the calls to respondent's attention the same day the call was received. Ms. MacDonald was asked the question, "[w]hat would [respondent] say?" She stated, "I don't recall his exact words." The questioning continued as follows:

Q. Did he ever tell you that he would take care of it?

A. There were times he would say he would take care of it, there were times we just told them hold off. I don't really recall exact instruction[s].

Q. [Did respondent] ever tell you to give a client inaccurate information with regard to receipt of the settlement proceeds?

A. Yes.

Q. And did you do that?

A. Yes.

Respondent's fourth exception is overruled.

■ Respondent next excepts to the hearing judge's finding that Mr. Silverman, a former associate of respondent's firm, was paid a portion of the fee which he was entitled to receive "before the case settled, or long afterwards." The actual testimony was that Mr. Silverman received his portion of the fee before the settlement sheet was approved by the client, not before the case settled. The client named in the tran-

script, Margo Frieder, signed the settlement statement on March 23. Mr. Silverman was paid his share of the fee on March 2. The testimony does not support the hearing judge's finding that Silverman was paid a fee before the case settled but rather that he was paid before the client had signed the settlement statement. Respondent's exception is sustained.

■ Respondent excepts to the hearing judge's finding that any of the money appropriated from the business account was used to benefit the respondent personally. Testimony of a number of witnesses established that respondent received numerous calls from banks indicating that his operating accounts were deficient. These calls precipitated withdrawals from the Trust account. In our view, whether the Trust money was used to benefit respondent directly by being transferred into his personal account or indirectly by being used to maintain his law practice is a distinction without a difference. Respondent was the sole stockholder of Zakroff & Associates, P.C. and essentially a solo practitioner. Any benefit to the firm is a benefit to him. Respondent's exception is overruled.

Respondent next excepts to the hearing judge's findings of fact regarding the Wardley Patterson matter.[15] For the most part respondent does not make specific exceptions to the judge's findings; rather, he presents his version of the Patterson events. As we recently noted in *Attorney Griev. Comm'n v. Pennington*, 387 Md. 565, 876 A.2d 642 (2005), "[t]he hearing judge is not required to set out all the facts in his findings and may select those deemed relevant and appropriate." (Citing *Attorney Griev. Comm'n v. Zdravkovich*, 381 Md. 680, 694, 852 A.2d 82, 90 (2004); *Attorney Griev. Comm'n v. Stolarz*, 379 Md. 387, 398, 842 A.2d 42, 48 (2004)). In

---

**15.** Much of respondent's exceptions to the court's findings of fact regarding the Patterson matter refer to a transcript dated September 13, 2004, where it appears respondent testified. The record received by the Court, however, does not contain a copy of the September 13 hearing transcript. The record received by the Court contained five transcripts dated, May 17, May 18, May 19, July 15, and October 27, 2004.

*Attorney Griev. Comm'n v. Vanderlinde,* 364 Md. 376, 385, 773 A.2d 463, 468 (2001), we reiterated what we said in *Attorney Griev. Comm'n v. Miller,* 301 Md. 592, 606–07, 483 A.2d 1281, 1289 (1984):

> The fact that this testimony was not specifically discussed in the court's finding does not indicate a failure to consider it. Moreover, the court was free to disregard this evidence if it was not credible. The reception of evidence is to a large degree entrusted to the discretion of the trial judge and will seldom be reversed.

Furthermore, we "shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses." Md Rule 16–759(b)(2)(B). The facts, as presented by the hearing judge, reflect his determination of witness credibility and are supported by the record. There are, however, four corrections. First, Jonathan Silverman, an associate in respondent's firm, learned of the existence of the claim against the Little estate when a new associate at the firm asked for his assistance in filing suit against the Estate on Patterson's behalf and not from a phone call from Richard Chisholm, the attorney for the Little estate. Second, the bankruptcy court sanctioned "counsel for the debtor," not the respondent, for filing an improper claim of exemption and for filing a frivolous motion. The attorney of record in the bankruptcy was Mr. Silverman. Third, respondent authorized his insurance carrier, on the advice of counsel, to pay $47,000 to settle the malpractice suit filed by the bankruptcy estate in connection with respondent's firm's handling of the Patterson bankruptcy. The respondent did not personally pay the money as indicated in the hearing judge's findings of fact. Lastly, the record does not support the hearing judge's finding that Joseph Langone, respondent's associate who attended the meeting of creditors in the bankruptcy court with Mr. Patterson, spoke with respondent about the Little estate following the creditors meeting and was "reassured by respondent that it was not a problem." With the exception of the four corrections listed above, respondent's exceptions to the hearing judge's findings of fact in the Patterson matter are overruled.

Respondent's next two exceptions relate to the testimony of Dr. Christianne Tellefsen.[16] First, respondent asks that we take notice of the fact that Dr. Tellefsen stated that respondent's condition was the root cause of his trust account problems and that in response to a question about how his condition affected his general well being outside his law practice, she responded, "... I would say that the problems that he has with his personality[,] with his functioning[,] were affecting everything that was going on in his life. But I, I wasn't able to find much that he was doing that was not affected." The hearing judge did not credit this aspect of Dr. Tellefsen's opinion. As we previously stated, however, the hearing judge may exercise his or her discretion in determining what facts to include in the findings of fact. *See Pennington,* 387 Md. 565, 876 A.2d 642. Respondent's exception is overruled.

Additionally, respondent excepts to the hearing judge's finding that Dr. Tellefsen testified that respondent knew that taking trust fund money was wrong. In fact, what the hearing judge found was that "notably, Dr. Tellefsen opined that there was no deliberate intent to violate rules, but only to cope. Respondent probably knew that taking the trust monies for his own use was wrong and that he felt badly about it. This dynamic only created more stress and more depression." In response to the question, "[a]ll right and in your opinion [respondent] would have known that it was wrong to use client funds for his own personal purposes?" Dr. Tellefsen responded "[o]h, sure." The record supports the hearing judge's findings. Respondent's exceptions to the findings of fact related to Dr. Tellefsen's testimony are overruled.[17]

---

16. In its findings of fact the hearing judge identified Dr. Tellefsen by the name of Kristin Tellefsen. We note that her first name is Christianne, not Kristin.

17. Respondent presented to the Court a list of remedial actions that he alleges to have undertaken. The actions were not listed in the hearing judge's findings. Respondent reports that he has taken accounting and office managerial courses at the University of Maryland, hired a Certified Public Accountant to reconcile his books and review his financial

Lastly, we overrule respondent's exceptions numbered 6, 7, 8, and 13 as they are based on information allegedly covered by the missing September 13, 2004, transcript. Without the transcript, we cannot say if the hearing judge erred in his findings regarding the issues. Furthermore, assuming the hearing judge did err, it would not change our disposition of this case.

■ With regard to the hearing judge's conclusions of law, respondent excepts to the hearing judge's conclusion that respondent violated BOP §§ 10–306 and 10–606. He argues that "any funds which were appropriated from one account to the other were done with the honest belief at the time that fees were due to the firm." The hearing judge found, however, based on respondent's "careful methodology and his sole control over the funds in question," that respondent's testimony regarding his "ignorance of account balances" was "not credible." He noted that "the sheer magnitude of the imbalance of the trust account, the repeated conduct of drawing upon it, the methodology used by the respondent, and his apparent appreciation of the wrongfulness, albeit rationalized away[,] contradicts his claim of ignorance." The judge also found that respondent's actions were committed "willfully" and that he "knew they were wrong." The hearing judge concluded that respondent's actions regarding the misuse of trust money was "understood and purposeful." We agree. There is ample evidence in the record to satisfy the clear and convincing standard that respondent violated BOP §§ 10–306 and 10–606. Respondent's exception is overruled.

transactions on a weekly basis, attended the Solo and Small Firm Workshop given by the Maryland State Bar Association, and has attended at least 16 hours of continuing legal education each year. He also continues to see Ms. Hurwitz on a weekly basis and is monitored by Dr. James Cooper, a psychiatrist. As we previously noted, we do not have a copy of the transcript from the day respondent testified nor are these facts contained in the transcripts filed in this case. Assuming, however, that respondent testified to these facts and that they are part of the record, they would not change our disposition of this matter.

■ Next respondent excepts to the court's conclusion that he violated Rule 8.4(c). Specifically, he argues that the testimony offered by Ms. MacDonald regarding respondent's instructions to mislead or lie to clients and the medical providers is insufficient to satisfy the clear and convincing standard. In support of this contention respondent cites *Attorney Griev. Comm'n v. Gallagher*, 371 Md. 673, 810 A.2d 996 (2002). In *Gallagher* we discussed the clear and convincing standard and the various ways in which it has been defined. We said:

> The requirement of "clear and convincing" or "satisfactory" evidence does not call for "unanswerable" or "conclusive" evidence. The quality of proof, to be clear and convincing, has also been said to be somewhere between the rule in ordinary civil cases and the requirement of criminal procedure—that is, it must be more than a mere preponderance but not beyond a reasonable doubt. It has also been said that the term "clear and convincing" evidence means that the witnesses to a fact must be found to be credible, and that the facts to which they testified are distinctly remembered and the details thereof narrated exactly and in due order, so as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. Whether evidence is clear and convincing requires weighing, comparing, testing, and judging its worth when considered in connection with all the facts and circumstances in evidence.

*Gallagher*, 371 Md. at 705, 810 A.2d at 1015 (internal citations and quotations omitted).

As discussed *supra*, Ms. MacDonald testified that on more than 20 occasions she provided inaccurate information to medical provider Phillips & Green in accordance with respondent's instruction. She also testified that she misled provider Greater Washington Orthopedic Group in the same manner. Additionally, she testified that she gave inaccurate information regarding settlement proceeds to clients per respondent's instructions. Her testimony was bolstered by the testimony of Mr. Silverman who stated that sometimes respondent instructed him to tell clients who called regarding their settle-

ments, "just tell them we'll pay them in like 30 days and put them off," despite the fact that in some of these instances settlement proceeds had been received. We hold that the clear and convincing standard has been satisfied; accordingly respondent's 8.4(c) exception is overruled. For the same reasons, respondent's exception to the conclusion that he violated Rule 1.15(b) is also overruled.

■ Respondent next excepts to the court's conclusions regarding the Wardley Patterson matter. This Court finds substantial support in the record for the hearing judge's conclusions that respondent's actions in connection with the Patterson matter, namely, intentionally hiding the Little claim from the bankruptcy estate, constituted violations of Rules 3.3(a), and 8.4(a), (c), and (d). The record reflects that Patterson's bankruptcy was filed in November of 2000. Although respondent was not the attorney of record, he was aware that his firm had filed the bankruptcy on Mr. Patterson's behalf. Despite this knowledge, he continued to negotiate with the Little estate until March 2001 without mentioning the bankruptcy or the need to include the bankruptcy trustee in any settlement. He only mentioned the bankruptcy in the negotiations after it was clear the Little estate was aware of the bankruptcy from other sources.[18] Mr. Chisholm, the attorney for the Little estate, testified regarding the March 5, 2001, phone call:

[Respondent] attempted to, [respondent] told me that the claim that Mr. Patterson had against the estate was intentionally left off the bankruptcy petition and that the money was not intended to go into the bankruptcy, to the bankruptcy trustee. I could scarcely believe what I was hearing. I asked him to repeat that. He repeated it nearly verbatim.

---

**18.** Mr. Chisholm testified that he received either a phone call or an e-mail from the personal representative of the estate indicating that she remembered something about Mr. Patterson filing for bankruptcy. Following the e-mail or phone call, Mr. Chisholm obtained a copy of the bankruptcy petition and learned that the claim against the estate was not listed. He then contacted respondent to inquire about who the proper party-in-interest should be in the negotiations.

I made a note.[19] I terminated the conversation because I didn't think there was anything further to discuss at that point. I needed to digest what I had just been told. Ms. Deborah Mathews, an associate at Mr. Chisholm's firm, testified that Mr. Chisholm had "very excited[ly]" come into her office following the conversation and told her that respondent had stated, "that he had deliberately left the claim off the bankruptcy filings." Respondent points to a note in his file from the March 5 phone call that indicates he told Mr. Chisholm that the bankruptcy trustee needed to be involved. The hearing judge, however, credited the testimony of Mr. Chisholm and Ms. MacDonald, and we rely on the fact finder's credibility determinations. Moreover, respondent's notes from March 5 do not explain away his failure to mention the bankruptcy to the Little estate during the previous three months of negotiations or why the trustee was not named in the civil suit. The hearing judge specifically found that respondent's testimony, that he filed the civil suit against the Little estate to preserve the claim on behalf of the trustee, was not credible. The record supports the hearing judge's conclusion that respondent intentionally omitted the Little claim from the bankruptcy schedules. Therefore, we overrule respondent's exception.

## C. Petitioner's Exceptions

Petitioner excepts to the hearing judge's finding that respondent began taking Zoloft[20] when he started consulting with Paulette Hurwitz, L.C.S.W., in 1999. The record reflects

---

19. Chisholm's notes read: "not put into writing to avoid bankruptcy; money would be paid after bankruptcy; intent was to keep it out of bankruptcy; bankruptcy trustee had no knowledge of this transaction; ch. 7 has been discharged w/in last 30 days; offered to settle for $42,500." Chisholm testified that he made the notes contemporaneously with the conversation but did not date them until almost a year later after consulting his billing statement to determine the date of the call.

20. Zoloft is the trade name for sertraline hydrochloride, used for treatment of major depression, panic disorder, posttraumatic stress disorder, among others. AHFS DRUG INFORMATION, 2232–46, American Society of Health System Pharmacists, (2005), § 28:16.04.20.

that respondent did not begin taking Zoloft until 2002, after the investigation in this matter began. The exception is sustained.

Petitioner also excepts to the hearing judge's finding that "[r]espondent took these actions in a determined and knowing manner, but without real need...." Petitioner excepts to this finding "to the extent that [the findings] do not make it clear that Respondent, on numerous occasions during the time in question, needed funds...." Petitioner notes that respondent's office received numerous calls from banks informing respondent that his professional accounts were deficient and that these calls resulted in withdrawals from the Trust account. We also note that Mr. Silverman testified that his paycheck bounced on more than one occasion, indicating balance deficits in the operating accounts. We sustain the exception to the extent it implies that respondent did not suffer financial need during the relevant time period.

### Sanction

■ The only remaining question is the appropriate sanction for respondent's misconduct. Petitioner recommends that we disbar respondent in light of the hearing court's findings that respondent engaged in dishonest conduct in connection with his client Trust account and the Patterson matter. Respondent argues that he "has been able to control his depression and related disabilities with the assistance of medication and has been a productive member of the Bar" and that the appropriate sanction should be limited to a thirty-day suspension.[21] He also maintains that "there was clear and convincing

---

21. We note that in his brief respondent makes a passing reference to the Americans with Disabilities Act, 102a USCA § 12112(a) ("ADA"), and states that respondent is a "qualified individual with a disability." From our review of the record it appears that respondent argued to the hearing judge that as a "qualified individual with a disability" the sanction of disbarment would be a violation of the federal law. In this Court, however, he presents no legal argument in support of the contention and, as we said, makes only a passing reference to the Act. We therefore decline to consider any implications of the ADA to this attorney discipline matter.

evidence that there was no fraud, dishonesty, deceit or misrepresentation by respondent" in connection to the Patterson matter and that, at most, he failed to properly supervise Mr. Silverman. He suggests that the proper sanction for failing to supervise Mr. Silverman is at most a concurrent thirty-day suspension. We agree with petitioner and find that disbarment is the appropriate sanction.

 We have said time and time again that our goal in matters of attorney discipline is to protect the public and the public's confidence in the legal profession rather than to punish the attorney. *See Pennington,* 387 Md. 565, 876 A.2d 642. "The public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed." *Attorney Griev. Comm'n v. Awuah,* 346 Md. 420, 435, 697 A.2d 446, 454 (1997) (internal citations omitted).

The standard for determining the appropriate sanction when an attorney's conduct involves intentional dishonesty and misappropriation was stated in the case of *Attorney Griev. Comm'n. v. Vanderlinde,* 364 Md. 376, 773 A.2d 463. In *Vanderlinde* we said:

[I]n cases of intentional dishonesty, misappropriation cases, fraud, stealing, serious criminal conduct and the like, we will not accept, as "compelling extenuating circumstances," anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the "root cause" of the misconduct and that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the MRPC. Only if the circumstances are that compelling, will we even consider imposing less than the most severe sanction of disbarment in cases of stealing, dishonesty, fraudulent conduct, the intentional misappropriation of funds or other serious criminal conduct, whether occurring in the practice of law or otherwise.

*Vanderlinde,* 364 Md. at 413–14, 773 A.2d at 485. *See also Attorney Griev. Comm'n v. Ezrin,* 312 Md. 603, 608–09, 541

A.2d 966, 969 (1988) (finding that the misappropriation of client funds "is an act infected with deceit and dishonesty and will result in disbarment in the absence of compelling circumstances justifying the lesser sanction").

The facts of this case support a finding of both intentional dishonesty and misappropriation on the part of the respondent.[22] The hearing judge specifically found that respondent "knowingly used client funds for unauthorized purposes." During the years 2000–2002, an audit by petitioner revealed shortfalls in the Trust account ranging from $174,000 to approximately $421,000. As we previously stated, the hearing judge found respondent's claims of ignorance regarding the Trust balance to be not credible given respondent's "pattern of conduct," "careful methodology," and his "sole control" over the Trust account. Respondent's instructions to members of his staff to mislead clients and third parties regarding the status of settlement proceeds and his handling of the Patterson matter are further evidence of dishonesty on the part of respondent.

 Having concluded that respondent engaged in intentional dishonesty and misappropriation, we apply the *Vanderlinde* mitigation standard.[23] The question then is whether

---

**22.** Respondent repeatedly states in his brief that the hearing judge found that there was "no intent to steal." In context, however, it is clear that the hearing judge found that "the sheer magnitude of the imbalance of the trust account, the repeated conduct of drawing upon it, the methodology used by the respondent, and his apparent appreciation of the wrongfulness, albeit rationalized away contradicts his claims of ignorance." The court found that respondent's actions in utilizing money from his trust account for improper purposes was taken in a "determined and knowing manner." This finding takes the matter out of the situation where an attorney unintentionally takes money from his Trust account and places it squarely within the *Vanderlinde* line of cases.

**23.** Respondent's reliance on *Attorney Griev. Comm'n v. Bailey*, 286 Md. 630, 408 A.2d 1330 (1979) is misplaced. Although we suspended the attorney in *Bailey*, we noted that "[h]ad there been a finding here of dishonesty supported by clear and convincing evidence or if we concluded that the trier of fact here was clearly in error in determining that this man did not intend to steal or consciously misappropriate the

there exists "compelling extenuating circumstances" that would warrant the imposition of a lesser sanction than disbarment. We find that there are not.

It is undisputed that respondent suffers from "significant" depression,[24] a mood disorder "not otherwise specified," and a personality disorder.[25] There was also testimony by a number of medical health professionals that his disorders were the root cause of his misbehavior. Dr. Janofsky, however, disagreed with this assessment, noting that, "personality disorders are ... generally not the root cause of any behaviors either in the criminal or the civil setting. They are just a way of describing who you are and how you react to certain situations. But they don't cause people to do anything." He also disagreed with the assessment that respondent suffered from a major depression. Assuming for the sake of argument that we accept the opinion that respondent's disorders were the root cause of his misbehavior, respondent would still fail to satisfy the *Vanderlinde* mitigation standard.

*Vanderlinde* requires that the disability be nothing "less than the most serious and utterly debilitating" mental condition and that the condition be not only the "root cause" of the misconduct but also result in the attorney's "utter inability to conform his or her conduct in accordance with the law and with the MRPC." Nothing in the record indicates that respon-

---

funds in question, we would disbar." *Bailey*, 286 Md. at 635–36, 408 A.2d at 1333. In this case, the hearing judge concluded that respondent knowingly misappropriated the Trust money. The appropriate sanction, therefore, is disbarment.

**24.** There is a difference of opinion between the various mental health professionals who testified regarding the severity of respondent's depression. Ms. Hurwitz and Dr. Michael Spodak characterized respondent's depression as "severe" while Dr. Tellefsen and Dr. Jeffrey Janofsky did not find "severe" depression. The hearing judge characterized the depression as "significant" in his findings and we adopt that characterization.

**25.** Dr. Tellefsen testified that a "personality disorder" is "diagnosed when somebody has a consistent and persistent manner of behaving and interacting with other people that tends to get them into trouble in characteristic ways."

dent suffered from a disorder that rendered him "utterly [unable] to conform [his] conduct in accordance with the law and with the MRPC." On the contrary, respondent maintained a successful law practice during the relevant period of time, grossing $890,000 in fees in 1999, $960,000 in 2000, and $1,020,000 in 2001. He testified that his law practice consisted of approximately 250 bankruptcy cases, 320–400 personal injury cases, and 1500–2000 collection matters. He also testified that he worked 70–80 hours per week.

The facts of this case are distinguishable from our recent case of *Attorney Griev. Comm'n v. Christopher*, 383 Md. 624, 861 A.2d 692 (2004), in which we found compelling extenuating circumstances. We noted:

> Mr. Christopher's severe major depression and alcoholism culminated in a three-month hospitalization which included the administration of antipsychotic and antidepressive drug therapy. His debilitating mental and physical condition lasted for a long period of time and was the root cause of his misconduct....

*Christopher*, 383 Md. at 648, 861 A.2d at 706. We also noted that Christopher's severe major depression and alcoholism affected his day-to-day practice of law. *Christopher*, 383 Md. at 649, 861 A.2d at 706. We indefinitely suspended Mr. Christopher with the right to apply for reinstatement. Unlike Mr. Christopher, whose severe major depression and alcoholism affected his day-to-day practice of law, respondent maintained a successful practice. His depression did not result in an "utter inability to conform his ... conduct in accordance with the law and with the MRPC."

Having concluded that respondent engaged in intentional dishonesty and misappropriation of client funds and that there are no "compelling extenuating circumstances" to justify a lesser sanction, we hold that the appropriate sanction is disbarment.[26]

---

26. We received a post-hearing memorandum filed by respondent which contained additional responses to questions posed during oral argu-

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–515(C), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST ROBERT JOEL ZAKROFF.*

ment. We have considered the memorandum and concluded that it does not affect our disposition of this matter.